Filed 10/9/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| JOHN DOE,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>THE REGENTS OF THE<br>UNIVERSITY OF CALIFORNIA<br>et al.,<br><br>     Defendants and Respondents. | 2d Civ. No. B283229<br>(Super. Ct. No. 16CV04867)<br>(Santa Barbara County) |

Due process - two preeminent words that are the lifeblood of our Constitution.  Not a precise term, but most everyone knows when it is present and when it is not.  It is often most conspicuous by its absence.  Its primary characteristic is fairness.  It is self-evident that a trial, an adjudication, or a hearing that may adversely affect a person's life must be conducted with fairness to all parties.

Here, a university held a hearing to determine whether a student violated its student code of conduct.  Noticeably absent was even a semblance of due process.  When the accused does not receive a fair hearing, neither does the accuser.

John Doe (John) was suspended from the University of California, Santa Barbara (UCSB) for eight quarters (two years) because he was found guilty of sexual misconduct in violation of UCSB's Student Conduct Code. He appeals the superior court's decision denying his petition for a writ of administrative mandate to compel UCSB to rescind his suspension. (Code Civ. Proc., § 1094.5, subd. (g).)

John was denied access to critical evidence; denied the opportunity to adequately cross-examine witnesses; and denied the opportunity to present evidence in his defense. UCSB denied John a fair hearing. We reverse.

FACTUAL AND PROCEDURAL BACKGROUND

John Doe and Jane Roe (Jane) were undergraduate students at UCSB. On the night of June 26, 2015, Jane attended a birthday party for John's girlfriend (eyewitness one) that was held in the apartment John shared with eyewitness one and another roommate (eyewitness two). Jane was intoxicated and decided to lie down under the covers on a mattress against the living room wall.

John returned home also intoxicated and wanted to lie down. Eyewitness one told him to lie down on the mattress for a nap because they were going to the beach later. He lay down fully clothed on top of the covers facing the wall with his back to Jane. Eyewitnesses one and two were talking, sitting on the couch, approximately two-and-a-half feet away.

Jane alleged that while she was asleep on the mattress, John sexually assaulted her. She alleged he aggressively fondled and sucked her breasts while she was in an incapacitated state and unable to consent; removed the bottom half of her clothing;

2

and penetrated her vagina and anus with his fingers and/or penis without her consent.

On June 28, 2015, two days after the alleged assault, Jane was medically examined by the Santa Barbara County Sexual Assault Response Team (SART). She reported the sexual assault to campus police, but declined to divulge the identity of the suspect or location of the sexual battery. On June 30, 2015, Jane's complaint was sent to UCSB's Title IX office. The office attempted to contact Jane for further information, but she did not respond and the file was closed.

One month later, on July 31, Jane informed campus police that she wished to proceed with her complaint. On August 3, 2015, the Title IX office initiated an investigation.

On September 16, 2015, the Office of Judicial Affairs (OJA) notified John that he was being placed on interim suspension pending an investigation into the incident, and was not allowed on campus or permitted to live in UCSB housing.

John contested the interim suspension and denied that he assaulted or had sexual contact with Jane. He attended an informal hearing with Suzanne Perkin, the assistant dean of students, on September 29, 2015. At that time, he submitted a statement to the OJA, as well as eyewitness statements and photographs to support his claim that he had not committed any of the alleged acts. On October 1, 2015, Perkin e-mailed campus police Detective Dawn Arviso to "reconfirm that there is physical evidence of an assault in this case." The detective replied by e-mail that "[t]he SART report states 'bruising and laceration noted in anal area.'" The detective, however, did not provide the SART report to Perkin. The detective's e-mail about the SART report was not disclosed to John or his counsel until several

3

months later.  Therefore, John could not respond to the SART report while attempting to contest his interim suspension.  On October 5, 2015, the vice chancellor consulted with Perkin and then upheld John's interim suspension with modifications.

According to UCSB, the Santa Barbara County Sheriff's Department requested that the Title IX office place its investigation on hold from November 4, 2015, to December 15, 2015.[1]  It was not until May 17, 2016, nearly a year after the alleged assault, that the Title IX office concluded its investigation and issued a report finding Jane's claims were substantiated.  The investigation took 173 working days (nearly 10 months) from the date the investigation was initiated (August 3, 2015) to the date the report was issued (May 17, 2016), excluding the time the investigation was placed on hold.

UCSB's written policies require prompt investigation of complaints for sexual harassment and sexual violence.  (U.C. Policy - Sexual Harassment & Sexual Violence (2014) § (V)(B)(4)(g) ["The investigation shall be completed as promptly as possible and in most cases *within 60 working days* of the date the request for formal investigation was filed.  This deadline may be extended on approval by a designated University official" (italics added)].)  The record does not reveal the reason for the delay here.

UCSB charged John with violating sections 102.08 and 102.09 of UCSB's Student Conduct Code.  Section 102.08 prohibits "[p]hysical abuse, sexual assault, threats of violence, or other conduct that threatens the health or safety of any persons."  Section 102.09 prohibits conduct amounting to sexual

---

[1] The administrative record does not include documentation of any such request by the sheriff's department.

harassment.  Violations of the Student Conduct Code that warrant a suspension or dismissal from UCSB are heard by the Sexual/Interpersonal Violence Conduct Committee (Committee).

On June 29, 2016, one year after the alleged conduct, John was notified that a hearing before the Committee was scheduled for July 12, 2016, to determine if he had violated the Student Conduct Code.  John was notified that he had until July 11, 12 days later, within which to submit any information he wanted the Committee to review, along with the name and contact information of any witnesses.  His witness list and information would be combined with the initial incident report, the Title IX officer's investigation notes and report, and UCSB's internal correspondence and notifications to the parties to create the "hearing packet."  John was advised that if he wished to review the hearing packet in advance of the hearing, he could make an appointment to review it with the director of judicial affairs in her office prior to the hearing, or he could review it at the hearing.

On July 6, 2016, John submitted his list of exhibits, evidence, and witnesses for the hearing.  Jane submitted no witness information or evidence at that time.

On the afternoon of July 11, 2016, the day before the scheduled hearing, the Committee Chair continued the hearing to August 16, 2016, "to ensure all requested information is gathered, made available for review in a timely manner to all parties prior to a hearing, and available for review by the [Committee] during the hearing."  John objected to the continuance, explaining that he and his witnesses had already made travel arrangements.  He stated that rescheduling created a hardship and prejudiced his defense; his key witness

5

(eyewitness one) would be studying abroad after July 26th and would be unable to attend the hearing. The OJA overruled his objection, explaining the Committee had "the right to postpone the hearing for a reasonable period of time to allow consultation with University General Counsel."

Prior to the August 16th hearing, Jane submitted her list of witnesses and two documents -- the cover page of her SART report and a second SART document that listed her current medications. John submitted a list of witnesses, detailed declarations from his roommates (eyewitnesses one and two), photographs of the living room, and the report of a polygraph examiner.

On August 16, 2016, a two-member Committee conducted a hearing to determine if John had sexually assaulted Jane in violation of the Student Conduct Code.

*Testimony at the Administrative Hearing*

Our review of the evidence is hindered by the state of the administrative record. The Student Conduct Code requires the OJA or UCSB's general counsel to audio record the proceeding and keep summary minutes of the hearing. (UCSB Student Conduct Code, § D, subd. 1.(d)(2)(c)(iv).) Nothing in the administrative record indicates an audio recording of the proceeding was made, and there is no transcript of the hearing. The minutes of the hearing included in the administrative record set forth the testimony, but are replete with redactions and ellipses. This court, therefore, is unable to determine whether portions of the testimony were omitted from the minutes.

Jane explained that she was good friends with John and eyewitness one and had spent the night at their apartment many times. She testified that on the night of the incident, she drank

wine and mango margaritas, played beer pong, and "hung out" in the living room with the eyewitnesses and others attending the party. At some point, she felt "pretty drunk" and decided to lie down on the mattress of the bottom bunk bed situated against the wall in the living room. The bottom bunk had a full size mattress and was barely three feet from the couch. Eyewitness one lent Jane pajamas and she lay on her side under the covers facing the back of the couch. The room was well lit and quiet. Several lamps were on and no music was playing.

Jane testified that, as she was sleeping in the bunk bed, "an intense, throbbing pain jerked [her] out of [her] sleep." She felt her "shirt scrunched up to her neck" and could tell her "stomach and breasts were exposed." She was "completely disoriented and unsure where [she] was or who was touching [her]." She said she "feared for [her] life, not knowing when this person would stop." She stated she "started to panic . . . yet [she] was frozen, paralyzed." She "pretended to be asleep [so] this person would eventually leave [her] alone." Jane testified that she could hear two people sitting on the couch next to her. She opened her eyes and realized she was in the living room. She said the two people on the couch were immersed in deep conversation. Jane said, "I resumed to act as though I was asleep. The sucking and biting went on for several minutes. . . . [H]e unhooked my bra; I realized this wasn't going to end." She heard the click of a cell phone camera and believed her assailant was taking photos of her naked breasts.

Jane testified that her assailant pulled her shirt down to cover her breasts and then pulled the blanket over to cover her. She wondered if she should yell out for attention in the hope that someone would hear her. She rolled over onto her back and the

7

assailant briefly stopped. She then felt "fingers penetrating [her] vagina and anus." Eventually, the person assaulting her got up and she realized it was John. She said she was in a complete state of shock and disbelief that a good friend was assaulting her.

Jane said that John returned to the bed and the assault continued. Jane did not want a confrontation and did not want anyone to know. She felt pain in her anus again, "worse pain that [she] felt in [her] life." She started to mumble, hoping it would appear she was talking in her sleep. Eyewitness one came over to check on her. Jane stated she told eyewitness one "in French that [she] did not feel good and wanted to go home." Eyewitness one got Jane water and then returned to the couch. Jane stated her "attempt at being rescued and going home [was] futile," the "fear was debilitating," she knew John was still there, and she started hyperventilating. She "started making noises again . . . but did not yell," and John stopped.

Eyewitness one came back and Jane told her, "[W]hoever's behind me is hurting me badly," this time in English. Jane said her "butt and nipples hurt." Jane testified eyewitness one tried to reassure her, telling her she "must be having a bad dream" and that her pants were still on. Jane claimed that eyewitness one pulled back the blanket, and when she saw that Jane's bottom half was bare (pajamas and underwear completely off), she screamed for everyone to get out of the apartment and started to cry. The eyewitnesses then walked Jane home, and Jane told them what happened.

John testified and denied all of Jane's accusations. He said he returned to the apartment around midnight to 12:30 a.m., after playing beer pong at another location. He was very intoxicated and was nodding off while sitting on the floor next to

the eyewitnesses. Eyewitness one told him to lie down for a nap on the bottom bunk with Jane, since the top bunk was covered with luggage and other items. John lay down fully clothed on top of the covers facing the wall, with his back to Jane. John testified that "[t]he first [he] heard of [Jane's] allegations was when she woke [him] up by basically yelling about someone hurting her." He was awakened from a deep sleep, thought she was having a nightmare, got up, and left eyewitness one "to figure out what was wrong."

John testified he has a genetic neurological disorder, a "form of palsy," which affects his motor skills, especially when tired or drunk. John's mother testified about his nervous system disorder, describing it as a movement disorder with tremors. They claimed his condition would render it difficult for him to unzip his pants while intoxicated, much less perform the acts alleged by Jane. John stated he could not take off a bra "quickly, smoothly, or quietly."

Eyewitness one testified by Skype and provided a declaration. She started dating John their freshman year in 2011. She was sitting on the couch, with her arm along the back of it, and the bed was often in her peripheral vision. Jane was under the covers, John was on top of the covers, and the two were lying back to back. She saw Jane wake up in the bed confused, disoriented, and mumbling in foreign languages that eyewitness one did not speak. She thought Jane was having a bad dream, and John was still asleep facing the wall. She said he usually "sleeps like a rock." She denied screaming or crying out when Jane woke up. She said she did not see or hear any sexual assault and maintained it was physically impossible for any of Jane's allegations to be true.

Eyewitness one stated that due to John's condition, his movements are not smooth or fluid. "[I]t would have been impossible for him to make any kind of movements toward [Jane], who was under [the] covers, without being noticed by me and my other roommate, and [he] certainly could not unhook a bra . . . ." When she and eyewitness two returned to the apartment after walking Jane home, they examined the mattress, sheets, and cover "for any visible signs or smells of bodily fluids" consistent with anal or vaginal penetration, but found none. Eyewitness one said Jane was her best friend at the time. She reiterated that if John had done anything, "I would have been on [Jane's] side."

In response to questions from the Committee, eyewitness one stated that when Jane got up from the bed, she was wearing a short sleeve shirt and underwear, but not the pajama bottoms. Eyewitness one said that frequently when Jane slept over, she would remove her pajama bottoms if she was hot.

Eyewitness two provided a declaration in which he corroborated eyewitness one's testimony and maintained that what Jane described was "not physically possible." John produced the sofa and mattress at the hearing to demonstrate the proximity of the eyewitnesses.

Dr. Louis Rovner, a polygraph examiner, testified by telephone. John's counsel retained him to administer a polygraph examination of John. Rovner holds a B.A., M.A., and a Ph.D. in Biopsychology. He is a member of the Panel of Experts of the Los Angeles County Superior Court, Criminal Division. He has published numerous articles about polygraph-related issues for scientific and professional journals.

Rovner opined that John's complete denial of the allegations against him was truthful. Rovner testified that given John's score on the exam, he was "absolutely certain" John was telling the truth when John responded to his questions about the night in question. The Committee asked if it would affect the test result if the person was intoxicated during the events he or she was questioned about. Rovner responded that any opinion from him on that question "would be pointless speculation."

*The SART Report Evidence*

Prior to the August 16th hearing, Jane submitted to the Committee two pages from the SART report. The first page is the cover page, containing only Jane's name. The second page identifies the name of the medical professional who performed the SART exam (Cynthia Hecox), and notes that Jane was taking Viibryd, a prescription antidepressant.[2] In the recommendation section on the second page, it states that Jane "was advised to take [a] warm bath in Epsom salt and relax anal muscles to help sooth discomfort." These two pages were included in the hearing packet. The record does not include details regarding how or when the hearing packet for the August 16th hearing was given to John. John states he received it the night before the hearing.

At the hearing, the Committee questioned Detective Arviso about the e-mail she sent to Assistant Dean Perkin on October 1, 2015. The e-mail reads: "[T]he SART report states 'there was bruising/laceration noted in the anal area.'" But the two pages of

---

[2] The second page of the SART report and minutes of the committee hearing refer to "Vybryyd." The superior court confirmed that the correct spelling for the medication is "Viibryd," and refers to it as such. For clarity, we use the spelling used in the superior court.

the SART report submitted by Jane do not contain this information. The Committee relied on the detective's recollection that this statement was in fact in the SART report. The Committee asked the detective if there were any other details from the report that could be shared. The detective testified, "I'm not able to disclose anything in great detail . . . case is open criminally; limits what I am able to share." The Committee then asked the detective whether this reference to "bruising/laceration" was unusual in a SART report. She testified that "it is not uncommon when there is an assault that this verbiage would be seen in a SART report," and stated the findings of the SART exam were consistent with the allegations in this case.

When questioned by John about how the "anal area" was defined in the SART report (i.e., was the bruising and laceration inside or outside), the detective stated: "That's exactly how it was written; my understanding looking at this particular sentence in exam . . . within the butt cheeks; I don't know what damage was done internally." The Committee then inquired: "Why was the sentence that you sent to Ms. Perkin from the [SART] exam the only portion that was shared or could be shared?" The detective responded that the information in the SART report was confidential because it was an ongoing investigation.

The detective testified that other than this "small snippet" that she selected from the report, it would not be "appropriate to disclose what additional findings came through [the] SART exam." When John asked if the findings in the SART report could have been caused by anything other than what Jane alleged, the detective said: "Well that's a rough question for me to

12

answer; I would say the findings in [the SART report] certainly could have occurred based on [the] allegations in [the] criminal case; I don't know what else could have caused it. . . . It's out of my realm, my scope to answer the questions." The complete SART report was not produced at the hearing or disclosed to John or his counsel.

*The Viibryd Evidence*

John was aware that Jane was taking an antidepressant prior to the hearing, but states he did not learn the name of the medication until the night before the August 16th hearing, when he received the hearing packet.

At the hearing, John asked Jane about the possible side effects of Viibryd, and its side effects when combined with alcohol. Jane refused to answer the question, stating, "It's my private medical information." John, attempting to explain his line of questioning, stated that Viibryd "has many side-effects" that "become severe when alcohol is consumed . . . such as hallucinations and sleep paralysis and night terrors."

John's mother attempted to testify about the side effects of Viibryd. She called the manufacturer of Viibryd that morning and wanted to testify about what she had learned from the manufacturer. The Committee Chair stated he could not accept this information in this format. When John persisted in asking his mother about Viibryd and the effects of sleep paralysis, the chair stated UCSB's general counsel advised him not to accept the testimony. John again asked his mother about the side effects of Viibryd, and general counsel interjected, stating: "You're trying to circumnavigate the procedures here. You do not have the expertise to lay the foundation for this type of evidence. We appreciate you feel you wish you had more time on the SART

exam but you [had] the opportunity to look at it prior to the hearing, but you can't backdoor this. If you have other relevant questions as to your mother having experience with your [central nervous system] diagnosis, that would be appropriate." John was not allowed to introduce any evidence about Viibryd.

*The Committee's Findings*

The Committee found by a preponderance of the evidence that John violated the Student Conduct Code. The Committee noted that both John and Jane "agreed that the room was well lit during the incident, and there was little ambient noise in the apartment . . . ." The Committee found that "it would have been possible for an assault as described to occur without the attention of witnesses who were facing each other and conversing." The Committee concluded that "[t]he results of the physical SART exam corroborate the report of vaginal and/or anal penetration with fingers and/or a penis." Relying in part on the SART report, the Committee rejected John's theory that Jane's use of alcohol while taking Viibryd caused Jane to hallucinate the incident. The Committee found the SART report supported the claim that a physical assault was committed, and, therefore, the use of Viibryd was unlikely to have caused Jane to fabricate the report. The Committee found Jane's "testimony and evidence provided throughout the investigation and hearing" more consistent than John's.

The Committee believed John suffered from a hereditary neurological disorder that causes tremors, but it concluded that "the condition would not necessarily make the assault as described impossible, and it may have even exacerbated the physical sensations [Jane] described and physical evidence described in relation to the incident." The Committee rejected

14

the polygraph evidence because John was drunk at the time of the incident and "there is no scientific evidence regarding the validity of polygraph examinations in this scenario."

The Committee recommended John be suspended for two years (eight quarters), starting Fall 2016. On September 2, 2016, the vice chancellor of student affairs notified John that she agreed with the Committee's recommended sanction. John sought review of the vice chancellor's decision. The chancellor affirmed the sanction, but adjusted the suspension to include the time John had already served on interim suspension. Therefore, his eight-quarter suspension was effective Fall 2015 through Summer 2017.

*The Superior Court Proceedings*

John filed a petition for a writ of administrative mandate in the superior court to challenge UCSB's decision. (Code Civ. Proc., § 1094.5.) John contended he was deprived of due process during the administrative hearing because, among other reasons, the Committee chose to apply the rules of evidence on an ad hoc basis and to withhold critical and exculpatory evidence. He argued he had not been able to see the SART report, about which the detective testified, and was not allowed to present evidence about the side effects of Viibryd.

At the hearing in the superior court on April 13, 2017, John's counsel informed the court that the Santa Barbara County District Attorney's Office had decided not to pursue any charges against John. John's counsel argued that a short continuance would allow John to get a copy of the SART report for the court's consideration. The superior court declined to continue the hearing or take further evidence outside the administrative

15

record.  A complete copy of the SART report is not included in the record on appeal.

The superior court denied the petition for a writ of mandate, noting that "[t]he better practice may have been to find a way to let [John] see the SART report or exclude any reference to a small portion of the findings in the report given out of context."  Nevertheless, the court concluded the admission of a small portion of the SART report and the detective's testimony were not prejudicial because the SART exam was not the sole supporting evidence for the Committee's conclusions.  The court also concluded John had not demonstrated he was prejudiced by the timing of the Committee's disclosure, the day before the hearing, of Jane's use of Viibryd or its exclusion of his mother's testimony.

DISCUSSION

John argues UCSB deprived him of his due process right to a fair hearing because it withheld critical evidence, improperly excluded relevant evidence, and selectively applied the formal rules of evidence.  He also argues UCSB abused its discretion by reaching findings that were not supported by substantial evidence in light of the whole record.

*Standard of Review*

"The scope of our review from a judgment on a petition for writ of mandate is the same as that of the trial court." (*Department of Corrections & Rehabilitation v. State Personnel Bd.* (2015) 238 Cal.App.4th 710, 716.)  Our review appears to be an amalgamation of the three standards of review that govern appellate practice.  We determine "whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of

16

discretion." (Code Civ. Proc., § 1094.5, subd. (b).) "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*) We review UCSB's findings for "substantial evidence in the light of the whole record." (*Id.*, subd. (c).)

We review the fairness of the administrative proceeding de novo. (*Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1073.) "'The statute's requirement of a '"fair trial'" means that there must have been "a fair administrative hearing.""" (*Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 239, quoting *Gonzalez v. Santa Clara County Dept. of Social Services* (2014) 223 Cal.App.4th 72, 96.) "[T]he University's rule-making powers and its relationship with its students are subject to federal constitutional guarantees." (*Goldberg v. Regents of University of California* (1967) 248 Cal.App.2d 867, 875.) In disciplining college students, the fundamental principles of fairness require, at a minimum, "giving the accused students notice of the charges and an opportunity to be heard in their own defense." (*Id.* at p. 881; *Goss v. Lopez* (1975) 419 U.S. 565, 581 [42 L.Ed.2d 725, 738].) "Where student discipline is at issue, the university must comply with its own policies and procedures." (*Doe*, at p. 1073.) "[T]he formal rules of evidence do not apply . . . ." (*Id.* at p. 1095.)

*UCSB Rules*

UCSB's Student Conduct Code provides: "Students who are subject to University discipline shall be afforded procedural due process, which is a basic principle underpinning the proper enforcement of University policies and campus regulations. The

17

primary purpose of any University disciplinary proceeding is to determine the guilt or innocence of the accused student. Deviations from established procedures shall not invalidate a finding of a hearing body unless the deviation significantly affected the result. It is recognized that University faculty, staff, and students are principally engaged in the business and the pursuit of education, and are not legally trained personnel. As such they should be guided more by principles of fairness and common sense than by formal rules of evidence or procedure." (*Id.*, § B.)

The Student Conduct Code requires UCSB and its designated officials to "[m]onitor the process to ensure the maintenance of procedural due process." (UCSB Student Conduct Code, § D, subd. 1.(d)(2)(c)(iii).) "Proceedings will provide a prompt, fair, and impartial investigation and resolution." (OJA Sexual/Interpersonal Violence Response Procedures for Sexual Assault (rev. Feb. 25, 2014) Proc. & Process When Reporting to Univ.)

In disciplinary hearings, the Committee "[s]hall receive verbal and documentary evidence of the kind on which reasonable persons are accustomed to rely in serious matters and may exclude irrelevant or unduly repetitious evidence." (UCSB Student Conduct Code, § D, subd. 1.(d)(2)(d)(iv).) An accused student "[s]hall have the right to confront and question all witnesses." (*Id.*, subd. 1.(d)(2)(a)(v).)

"The accused has the right to due process as outlined in the *Campus Regulations*. Among these rights are: [¶] (i) The right to written notice of the charges, [¶] (ii) To be accompanied at the hearing by an advisor of his/her choice, [¶] (iii) To be present for the duration of the hearing, [¶] (iv) To produce

18

witnesses and evidence pertaining to the case, [¶] (v) To question all witnesses, [¶] [and] (vi) To simultaneously with the accuser, be informed in writing of the outcome of any institutional disciplinary proceeding, the institution's procedures for appealing the results of the proceeding, any change to the results that occur prior to the time that such results become final, and when such results become final." (OJA Sexual/Interpersonal Violence Response Procedures for Sexual Assault, *supra*, Proc. & Process When Reporting to Univ., Rights of the Complainant.)

*Lack of a Fair Hearing*

*Limited access to the SART report*

John contends he was deprived of a fair hearing when the Committee allowed the detective to testify about a single phrase from the SART report without requiring production of the entire report to the Committee and to him. Without access to the complete SART report, John did not have a fair opportunity to cross-examine the detective and challenge the medical finding in the report. The accused must be permitted to see the evidence against him. Need we say more?

The Committee need not strictly adhere to the "formal rules of evidence or procedure," but these rules serve as a guide for the Committee to arrive at a decision based on "principles of fairness and common sense." (UCSB Student Conduct Code, § B.) We refer to these rules to illustrate where fairness is lacking.

For example, the best evidence rule (now the secondary evidence rule in California) precludes oral testimony to prove the content of a writing. (Evid. Code, § 1523.) "The principal rationale advanced for the best evidence rule is to insure that the trier of fact is presented with the exact words of a writing." (Grad & Prairie, *The Best Evidence Rule: A Critical Appraisal of*

*the Law in California* (1976) 9 U.C. Davis L.Rev. 257, 258.) "[T]he chance of error is substantial when a witness purports to recall from memory the terms of a writing. [¶] The rule is also thought to help prevent fraud." (*Id.* at p. 259.) "The final rationale offered for the rule is that inspection of an original document could reveal valuable information not disclosed . . . ." (*Ibid.*) This is because it is unfair to have a witness testify about the contents of a writing without producing the actual writing for examination.

Here, the only substantive portion of the SART report considered by the Committee, and provided to John prior to the hearing, was the phrase quoted in the detective's e-mail of October 1, 2015. Without the complete SART report, the trier of fact was left to rely on the detective's recollection and veracity. To argue that it is fair to allow the detective to testify about the contents of the SART report, but preclude the accused and the trier of fact from seeing the report, strains credulity. (See *Goss v. Lopez*, *supra*, 419 U.S. at p. 582 [42 L.Ed.2d at p. 739] [student must be told "the basis of the accusation"].)

In addition, the rule of completeness, Evidence Code section 356, would have allowed John to inquire into the whole of the SART report, once a portion of the report was quoted during the detective's testimony. "The purpose of Evidence Code section 356 is 'to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed.'" (*People v. Clark* (2016) 63 Cal.4th 522, 600.) It was unfair to allow the detective to select and describe only a portion of the SART report, without producing the complete report. John's lack of access to the entire

report prevented effective cross-examination and hampered his ability to present a defense.

Here, the detective testified that the single phrase in the SART report was consistent with Jane's allegations. But when questioned by John about other potential causes of the SART finding, the detective said it was outside the scope of her expertise. The detective's inability to answer whether the finding in the SART report could be caused by anything other than Jane's allegations underscores the unfairness of allowing the detective to testify about the report when she had not authored the report or conducted the medical examination, and was unqualified to give an expert opinion on causation. Allowing the detective to select and describe a portion of the report denied John the opportunity to effectively challenge the evidence used to determine his guilt. (Cf. *Doe v. Regents of University of California*, *supra*, 5 Cal.App.5th at p. 1098 [unlike this case, failure to disclose interview notes not before the hearing panel did not prevent the student "from having a meaningful opportunity to present his defense"].)

The Committee relied on the SART evidence to find that John sexually assaulted Jane and violated the Student Conduct Code. It concluded that this evidence corroborated Jane's "report of vaginal and/or anal penetration with fingers and/or a penis." The Committee also found that John's "theory that [Jane's] antidepressant combined with alcohol precipitated the incident is unlikely, especially when combined with the findings of the physical SART exam . . . ." The SART report was critical evidence, but the Committee did not have the report. At a minimum, UCSB should have required the detective to provide a complete copy of the SART report.

21

The Committee should not have considered the SART evidence without giving John timely and complete access to the report. (See *Doe v. University of Southern California, supra*, 246 Cal.App.4th at p. 247 ["common law requirements for a fair hearing under Code of Civil Procedure section 1094.5 do not allow an administrative board to rely on evidence that has never been revealed to the accused"].) Without this evidence, the Committee could have concluded there was not a preponderance of evidence that John violated the Student Conduct Code. The error was prejudicial and requires reversal.

*Other Cumulative Errors*

In the event of a future administrative hearing in this case, we discuss additional cumulative errors that occurred at the hearing.

John contends that UCSB's untimely disclosure of the Viibryd evidence deprived him of the opportunity to obtain an expert to testify about the side effects of Viibryd, and the opportunity to effectively cross-examine Jane. He also argues UCSB inconsistently applied its policies and procedures and selectively applied formal evidentiary rules, to his detriment. We agree. While UCSB's rules provide "no formal right to discovery," the Committee's rulings during the hearing placed John in a catch-22; he learned the name of the medication Jane was taking too late to allow him to obtain an expert opinion, but the Committee precluded John from offering evidence of the side effects of Viibryd without an expert. (*Doe v. Regents of University of California, supra*, 5 Cal.App.5th at p. 1095.)

The Committee recognized the relevance of the Viibryd issue, but it rejected John's claim about insufficient notice by stating John "*already* had knowledge" about Jane's use of

antidepressant medications; he just did not know what exact medication she was taking until the night before the hearing. No reputable expert could have offered an opinion without knowing the exact medication Jane was taking. Because no formal right to discovery exists in UCSB's student conduct hearings, and the formal rules of evidence do not apply, John should have been allowed to introduce evidence of the side effects of Viibryd through his mother's testimony or some other informal method.

Moreover, John's counsel was not allowed to actively participate in the hearing. "Students are to represent themselves. The role of the attorney or advisor is therefore limited to assistance and support of the student in making his/her own case." (UCSB Student Conduct Code, § D, subd. 1.(d)(2)(a)(ii); *Doe v. Regents of University of California*, *supra*, 5 Cal.App.5th at pp. 1082-1084 [student not deprived of fair hearing where counsel not allowed to actively participate].) The Committee, however, permitted UCSB's general counsel to actively participate and to make formal evidentiary objections. This unfairness is magnified when UCSB's general counsel is allowed to make formal evidentiary objections, which UCSB's policies and procedures do not permit. A student, whose counsel cannot actively participate, is set up for failure because he or she lacks the legal training and experience to respond effectively to formal evidentiary objections.

The Committee also selectively applied the formal rules of evidence to John's detriment. The Committee precluded John's mother from offering testimony about the side effects of Viibryd based on a lack of foundation. But it allowed the detective to offer an expert medical opinion on causation, even though she was not a medical expert and had not authored the SART report.

23

Finally, the Committee inexplicably allowed Jane to decline to respond to John's questions about the side effects of Viibryd on the ground that it was her "private medical information." This deprived John of his right to cross-examine Jane and impeded his ability to present relevant evidence in support of his defense. (See, e.g., *Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055, 1070 [when a disciplinary determination turns on the complaining witness's credibility, the accused student is entitled to a process by which the complainant answers his questions]; *Doe v. Regents of University of California*, *supra*, 5 Cal.App.5th at p. 1084.) Here, John could not present evidence of the side effects of Viibryd through his mother's testimony and Jane was not required to answer his questions.

The Committee's refusal to hear John's evidence of the side effects of Viibryd was prejudicial. Jane's behavior, as described by eyewitness one, was consistent with John's theory that Jane was experiencing the side effects of consuming alcohol while taking Viibryd.

Without hearing all of John's evidence, the Committee rejected John's defense, concluding that Jane's allegations were corroborated by the physical finding in the SART report. Thus, the error in excluding John's evidence of the side effects of Viibryd was compounded by admitting only a portion of the SART report.

The Committee reached a significant finding based on nothing more than speculation. While it believed John suffered from a hereditary neurological disorder that causes tremors, it concluded "the condition would not necessarily make the assault as described impossible, and it may have even exacerbated the physical sensations [Jane] described and physical evidence

described in relation to the incident." We question the committee's expertise to arrive at this startling conclusion.

It is ironic that an institution of higher learning, where American history and government are taught, should stray so far from the principles that underlie our democracy. This case turned on the Committee's determination of the credibility of the witnesses. Credibility cannot be properly decided until the accused is given the opportunity to adequately respond to the accusation. The lack of due process in the hearing here precluded a fair evaluation of the witnesses' credibility. In this respect, neither Jane nor John received a fair hearing.

In light of our conclusion, it is unnecessary to discuss John's remaining contention concerning sufficiency of the evidence.

## DISPOSITION

The judgment is reversed and the matter is remanded to the superior court with directions to grant John's petition for a writ of administrative mandate. John is awarded costs on appeal.

<u>CERTIFIED FOR PUBLICATION.</u>


GILBERT, P. J.

We concur:

YEGAN, J.          PERREN, J.


25

Donna D. Geck, Judge
Superior Court County of Santa Barbara

_____

Leader & Berkon, LLP, Arthur I. Willner for Plaintiff and Appellant.

Nye, Peabody, Stirling, Hale & Miller, LLP, Jonathan D. Miller, Alison M. Bernal for Defendants and Respondents The Regents of the University of California, Margaret Klawunn, and Henry T. Yang.