Filed 4/30/24; Certified for Publication 5/28/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CHAD AYACH et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>THE REGENTS OF THE<br>UNIVERSITY OF CALIFORNIA<br>et al.,<br><br>    Defendants and Respondents. | B325545<br><br>(Los Angeles County<br>Super. Ct. No. 21STCP01434) |

        APPEAL from an order of the Superior Court of
Los Angeles County, Mitchell L. Beckloff, Judge.  Affirmed.
        David Romley for Plaintiffs and Appellants.
        Venable and Jean-Paul P. Cart for Defendants and
Respondents.

Appellants Chad Ayach and Joseph Nofal appeal from the denial of a petition for writ of administrative mandate challenging their expulsions from the University of California Riverside (UC Riverside or the University).[1]  Nofal and Ayach contend that the University's administrative hearings leading to their expulsions did not afford them due process because (1) the charging documents and evidence presented used pseudonyms to identify witnesses who provided statements to university investigators, and (2) Nofal and Ayach were purportedly denied the opportunity to confront or cross-examine these witnesses at the hearing.  Due process in the context of university disciplinary proceedings is a flexible concept that depends on the specific circumstances and charges at issue in each particular case.  We conclude that the challenged administrative proceedings afforded Nofal and Ayach the process they were due, given the nature of the charges and their response.  Accordingly, we affirm the judgment denying the petition.

---

[1] Respondents in this appeal are the entities and individuals named as defendants in the writ proceeding below, namely:  The Regents of the University of California (identified in the petition as simply "University of California") and several individuals employed by the "University of California," namely Michelle Moran, Robert Stephens, Christine Mata, Christine Bender, and Brendan O'Brien (collectively, respondents).

# FACTS AND PROCEEDINGS BELOW

### A.    *UC Riverside's Initial Investigation of Phi Gamma Delta*

In early 2019, UC Riverside's Student Conduct and Academic Integrity Programs office (SCAIP) received a report expressing concern for the health of a member of the Phi Gamma Delta fraternity (PGD) pledge class at UC Riverside. SCAIP began an investigation into the PGD pledge process. During the time period relevant to the disciplinary investigation, Nofal was PGD's UC Riverside chapter president, and Ayach was the "disciplinarian" for the chapter's pledge campaign. (Capitalization omitted.)

SCAIP's investigator conducted interviews of most of PGD's 2018 and 2019 pledges. During these interviews, the pledges stated that: (1) As part of the pledge process, pledges were forced to complete workouts as "punishments"; (2) at least one such workout took place outdoors at night for several hours; (3) PGD had a practice of taking away "pledge pins," which in one instance led to an altercation in which a pledge used a projectile stun gun on a PGD member ("tasing" the member); (4) PGD had a "check" system that required pledges to complete household tasks and chores for the members to work off their "checks"; (5) PGD would question pledges in an "intense" setting as part of the pledge process; (6) pledges were required to wear "feminine" clothing to a party; and (7) PGD performed a "date auction" where pledges were "sold" to bidders.

### B.    *Initial Notices to Nofal and Ayach of UC Riverside Administrative Review Meeting*

In April 2019, SCAIP sent Nofal and Ayach "notice[s] to schedule and appear for an administrative review meeting."

3

(Capitalization omitted.)  These notices informed Nofal and Ayach that SCAIP had "received a detailed description of the components of [PGD's] pledge process, including many activities appearing to meet [UC Riverside] definitions of hazing," namely kidnapping, tasing, sale of pledges at a date auction, physical workouts, assignment of chores, exposure to the elements, sleep deprivation, heavy alcohol consumption, and coordinated dishonesty.  The notices also identified the sections of the "University['s] Policies Applying to Campus Activities, Organizations, and Students—100.00 Policy on Student Conduct and Discipline" (the student conduct policy) SCAIP was concerned the pledge process had violated.[2]  The notices informed Nofal and Ayach that "an administrative review process [had] begun," which process presented them an "opportunity to provide information which clarifies your involvement or contributes to SCAIP's resolution of the situation."  (Capitalization omitted.)  The notices requested

_____

[2] The student conduct policy sets forth, among other things, 26 categories of conduct that UC Riverside students are prohibited from engaging in on campus or in connection with university-related activities.  The three listed in the notices Nofal and Ayach received are:  (1) section 102.08, addressing physical abuse and threats of physical abuse; (2) section 102.12, addressing "[p]articipation in hazing or any method of initiation or pre-initiation into a campus organization or other activity engaged in by the organization or members of the organization at any time that causes, or is likely to cause, physical injury or personal degradation or disgrace resulting in psychological harm to any student or other person"; and (3) section 102.18, addressing the use, distribution, and possession of alcohol in a manner that is illegal or inconsistent with UC Riverside policies and regulation.

4

Nofal and Ayach schedule an administrative review within a certain time frame.

### C. *Nofal's Statements to the SCAIP Investigator*

Nofal met with the SCAIP investigator on May 7, 2019 and denied that the conduct described in the notice had occurred as part of the PGD pledge process or that PGD would have condoned such conduct. Nofal further denied that PGD had a "disciplinarian" for its pledge process. (Capitalization omitted.) After statements of "Student A"—the student whose wellness check had triggered the investigation—were read aloud to Nofal, Nofal stated he knew who Student A was.

Less than two weeks later, on May 17, 2019, Nofal told the SCAIP investigator that many of the allegations in the notice were true, defending some of them as part of "40 years of traditions." Specifically, Nofal admitted (1) there was a process of taking away "pledge pins" and retrieving them by kidnapping and "exchang[ing]" a PGD member for the pin, (2) that in one instance, this led to a tasing incident during what was described by others as a mock kidnapping, (3) the existence of the date auction, (4) that pledges were forced to perform physical workouts, and (5) that PGD had a "check" system whereby pledges could "work off checks by helping active members with certain tasks." More specifically, Nofal admitted that in one instance, a pledge brought a taser to the "exchange" of a member for a pledge pin, and tased one of the members, whom Nofal identified by name and claimed to have spoken with about the incident. Nofal stated he was aware that it was PGD's practice to have pledges do pushups and planks as part of the pledge process, but first claimed he was not present for this, then said he "thought they'd gotten rid of it." Nofal indicated the "pledge

5

educator" was the individual in charge of this, and that Nofal would speak to him about it. Despite having initially denied there was a "disciplinarian" in the pledge process, Nofal acknowledged that there was, and that Ayach played this role, pursuant to which Ayach was responsible for tracking pledge checks and their work to clear them.

Nofal continued to deny that alcohol was part of PGD's pledge process, but acknowledged that the PGD pledge tradition of a "big brother" taking on a "little brother"—also referred to as a "big/little [brother] reveal"—involved an alcohol drinking competition.

### D.     *Ayach's Written Statement*

Ayach submitted a written statement to SCAIP during the investigation and administrative review process. In his statement, Ayach confirmed Nofal's account that a pledge had tased a member during a pledge pin-member "exchange." Ayach stated a date auction took place as part of the pledge process, but that it was not mandatory for pledges. He likewise confirmed that pledges were required to perform workouts, and that when pledges received "checks," they could work them off by helping members in "clean[ing] up after events, or help[ing] them clean their house." Ayach generally denied alcohol consumption was part of the hazing process, but stated that PGD has "one official chapter event where the pledges are invited to drink an Irish car bomb"—a combination of beer and liquor—with their "big brother."

6

### E.    *Additional SCAIP Investigation Interviews of Note*

On May 24, 2019, SCAIP's investigator interviewed a PGD member who identified himself as the PGD president immediately prior to Nofal.  He stated that pledges were required to do physical workouts, including as punishment, and that the role of the disciplinarian is to oversee some workouts.  With respect to the "check" process, he likewise confirmed that pledges are assigned duties to work off their checks, such as "[w]ashing dishes [or] mopping floors."  Like Ayach, he explained that a big brother-little brother "tradition" involved the two individuals drinking "Irish car bombs," adding that "they chug to see who does it the quickest."

On June 3, 2019, SCAIP's investigator interviewed a PGD pledge from the relevant time period.  He confirmed that the tasing incident took place during a mock "kidnapping" to retrieve pledge pins.  He also confirmed that pledges were required to do physical workouts, and described a two to three-hour workout one night.

### F.    *UC Riverside Hearings Regarding Ayach and Nofal*

On June 18, 2019, SCAIP sent Ayach and Nofal notices that their respective cases had been referred to the student conduct committee (the committee) for a hearing.  In these and subsequent notices SCAIP sent in September 2019, the University provided additional details about the investigation.  They noted that SCAIP had received reports that a student's "participat[ion] in hazing activities with [PGD] . . . contributed to a welfare check of the student."  "[P]rofessional staff members [had] interviewed both the fall 2018 and winter 2019 [PGD]

7

pledge classes" and believed "most of the pledges were generally dishonest within these interviews, which some students later attributed to following directions from their advisors." (Capitalization omitted.) The notices further identified "some helpful information" about the PGD pledge process nevertheless collected from these interviews, namely: "the role of a disciplinarian within the pledge process"; "the completion of workouts identified as 'punishment' by several pledges"; "a description of an outdoor workout which lasted several hours at night"; "a situation in which pledge pins were taken away from the fall pledge class and ultimately resulted in the tasing of an active member"; "a check system in which checks could be forgiven through completion of household tasks"; "quizzes conducted in an environment which was described as 'intense' "; "requirement of the fall pledge class to wear 'feminine' outfits at a party"; and "a date auction." (Capitalization omitted.) The notices advised that, based on this information, as well as Nofal's and Ayach's respective roles in the organization—Nofal as its president and Ayach as its pledge class disciplinarian—SCAIP had referred the matter for hearings before the committee. The notices invited each student to schedule a pre-hearing meeting so that SCAIP could explain the applicable procedures and each student's rights.

### 1. *Ayach*

Ayach's hearing before the committee took place on October 3, 2019. The hearing began with a committee representative explaining the charges. SCAIP's investigator then presented the information that she had obtained throughout the course of her investigation and presented the committee with a "master packet" containing the reports and notes from the

investigation.  (Capitalization omitted.)  In both the investigator's presentation and the written packet, the identities of the witnesses were replaced with initials.[3]

UC Riverside policy and committee procedures do not provide a means by which a student facing discipline can compel an individual to testify at a committee hearing, but do permit a student to present such live testimony.  Nothing in the record suggests Ayach attempted to call as witnesses any of the individuals who provided information to the investigator, asked the University for the identities of any such individuals for this purpose, or brought to the attention of the committee the refusal of any such individual to appear.  Ayach did, however, present his case to the committee and answered their questions.

On November 6, 2019, the committee issued its "decision and sanctions," finding by a preponderance of the evidence that Ayach violated all three of the conduct policy provisions at issue. (Capitalization omitted.)  The decision explained the basis for the committee's decision in detail.  The decision specifically identified various pledge activities that the committee had determined violated the student conduct policy, and that Ayach had admitted to being aware of or participating in.  The committee rejected Ayach's argument, made at the hearing, that his role as pledge class "disciplinarian" rendered him responsible for the conduct of others in connection with the pledge process.  The decision also

---

[3] At the hearing before this court, counsel suggested that procedures for committee hearings required the University to provide the student facing discipline with the identities of all "witnesses."  This policy actually requires disclosure of the identities of "witnesses that may be called by the University at the hearing."

9

noted the ways in which Ayach had given conflicting statements regarding several practices. Ultimately, the committee imposed the sanction of dismissal from UC Riverside.

Ayach timely appealed the decision to the UC Riverside vice-chancellor and dean of students. With respect to his procedural rights, Ayach argued that the University had withheld information from him because the master packet used pseudonyms to identify the PGD members SCAIP interviewed, and that he had been denied the right to cross-examine witnesses against him.

On December 16, 2019, the vice-chancellor denied Ayach's administrative appeal via a letter. The letter stated that SCAIP and the committee had followed applicable UC Riverside policies, which required the opportunity to cross-examine only those witnesses presented to the committee to testify. Regarding the withholding of witness names in case materials presented at the hearing, the letter concluded this was in accordance with university standards, but that "this does not equate to their identities remaining hidden or being withheld," noting that "during the hearings, if [Ayach] asked the chairperson about who made certain statements, the chairperson gave the names of those individuals." (Capitalization omitted.)

### 2. *Nofal*

Nofal's hearing before the committee took place on September 10, 2019. Nofal's hearing proceeded in the same manner as Ayach's: The committee explained the charges, SCAIP's investigator presented the results of her investigation and provided a "master packet," and Nofal presented his case to the committee and answered their questions. (Capitalization omitted.) Nothing in the record suggests Nofal attempted to call

as witnesses any of the individuals who provided information to the investigator, asked the University for the identities of any such individuals for this purpose, or brought to the attention of the committee the refusal of any such individual to appear. As was the case at Ayach's hearing, both the investigator's presentation and the master packet used pseudonyms to refer to the witnesses SCAIP interviewed.

Nofal's defense arguments were similar to those of Ayach at his hearing. Namely, Nofal argued not that the alleged events never took place, but rather that Nofal was not responsible for them. Nofal further argued that some of the activities at issue, such as the existence of a "checks" system and the date auction, did not constitute hazing in violation of university policies.

On November 6, 2019, the committee issued a decision and sanctions, in which it found by a preponderance of the evidence that Nofal violated all three of the conduct policy provisions at issue. In the decision, the committee expressly rejected Nofal's defenses, finding among other things that Nofal's role as president meant he could have prevented the misconduct, that his claims of ignorance were not credible, and that he acknowledged a history of improper "traditions" at PGD yet failed to take any concrete actions to address them.

Like Ayach, Nofal timely appealed the decision to the vice-chancellor. In so doing, Nofal argued that "[t]he case against [him] [was] based solely on the fact that [he] happened to be the president of the chapter." He also argued that the identities of witnesses were "secret."

The vice-chancellor denied Nofal's administrative appeal via a December 12, 2019 letter. With respect to Nofal's argument that he did not "participate" in the misconduct, the

11

vice-chancellor agreed with the committee that, as president, Nofal had the ability to change its practices and culture, yet failed to do so. The vice-chancellor further concluded, as he had in denying Ayach's appeal, that the committee had correctly applied university policy with respect to witness identification, and that "during the hearings, if [Nofal] asked the chairperson about who made certain statements, the chairperson gave the names of those individuals." (Capitalization omitted.)

### G.    *Appellant's Petition for Writ of Mandate*

On May 5, 2021, Nofal and Ayach filed a petition for writ of mandate in Los Angeles Superior Court challenging their expulsion from UC Riverside. The petition asserted four arguments: (1) Nofal and Ayach were "prevented from conducting any meaningful investigation of the charges" because certain names were redacted in the charging documents; (2) Nofal and Ayach were unable to cross-examine witnesses; (3) the "purported victim of the alleged kidnapping did not appear"; and (4) the committee was biased. Ayach and Nofal also filed nearly identical declarations wherein they contended that they had "no way of knowing" the identities of those whose statements were reflected in the SCAIP investigator's reports.

The court denied the petition on September 14, 2022. On December 13, 2022, the court entered judgment in favor of defendants and denied Ayach and Nofal's petition. This appeal followed.

## DISCUSSION

"The scope of our review from a judgment on a petition for writ of mandate is the same as that of the trial court," such that we " 'review[ ] the [UC Riverside] decision, rather than the trial

court's decision, applying the same standard of review applicable in the trial court.' [Citation.]" (*Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 239 (*University of Southern California*).) For Nofal and Ayach to have prevailed in the superior court on their petition, they were required to show that UC Riverside either "(1) acted without, or in excess of, its jurisdiction; (2) deprived [him] of a fair administrative hearing; or (3) committed a prejudicial abuse of discretion." (*Doe v. Regents of University of California* (2021) 70 Cal.App.5th 521, 532 (*2021 Regents*).)

On appeal to this court, Nofal and Ayach argue only that the University deprived them of fair administrative hearings prior to expelling them. Specifically, they contend that their respective hearings before the committee, did not afford them the process they were due under the circumstances in three ways. First, they argue that, because UC Riverside "kept the identities of all adverse witnesses . . . secret," they were "depriv[ed] . . . of any meaningful way of investigating the allegations against them." Second, they argue that because "[t]he unidentified witnesses did not appear at [the] . . . hearings," Nofal and Ayach were "depriv[ed] . . . of the right to confront the unknown adverse witnesses or to assess their credibility." Third, they argue that "[t]he purported victim"—that is, the pledge class member whose welfare check spurned the disciplinary investigation— "did not appear or testify at the . . . hearings, thereby depriving [Nofal and Ayach] of the right of confrontation." Our review of the committee decision in light of these arguments is de novo. (*University of Southern California, supra*, 246 Cal.App.4th at p. 239; *2021 Regents, supra,* 70 Cal.App.5th at p. 533 ["[w]hen reviewing a claim that a petitioner did not receive a fair

13

hearing, . . . [and] the evidence is substantially undisputed, the issue becomes a question of law, which we review de novo"].)

Due process at a student disciplinary hearing "need not be a full[-]dress judicial hearing but one giving the student a full opportunity to present his defenses." (*Andersen v. Regents of University of California* (1972) 22 Cal.App.3d 763, 771 (*Andersen*); accord, *Goss v. Lopez* (1975) 419 U.S. 565, 584 (*Goss*); *Doe v. Westmont College* (2019) 34 Cal.App.5th 622, 635 (*Westmont*).) "Courts have observed that student disciplinary proceedings in university settings do not require 'all the safeguards and formalities of a criminal trial' [citation] and a university ' "is not required to convert its classrooms into courtrooms." ' [Citations]." (*2021 Regents, supra,* 70 Cal.App.5th at p. 534.) Thus, the essential requirements of due process in this context have been broadly framed as: "(1) a notice containing a statement of the specific charges" and grounds which, if proven, would justify discipline under the applicable regulations of the university; and "(2) a hearing whose scope and nature of which should vary according to the circumstances of the particular case" (*Andersen, supra*, 22 Cal.App.3d at p. 771, capitalization omitted) so that it affords the student a meaningful ability to present his defense by giving him "the opportunity to characterize his conduct and put it in what [the student] deems the proper context." (*Goss, supra*, at p. 584.)

### A. *The Authority Nofal and Ayach Cite Requiring Live Witness Testimony, Cross-Examination, and Identification of Witnesses By Name Is Inapplicable*

Nofal and Ayach argue that they did not receive the "full opportunity to present [their] defenses" that due process requires.

(*Andersen, supra*, 22 Cal.App.3d at p. 771.)  To support their argument, they rely exclusively on cases holding a student accused of sexual misconduct did not receive a fair disciplinary hearing when the university or college did not inform the student of the identities of adverse witnesses, and/or the administrative proceeding did not permit the student to confront or cross-examine those witnesses.  (See *Westmont, supra*, 34 Cal.App.5th 622; *Doe v. Regents of University of California* (2018) 28 Cal.App.5th 44 (*2018 Regents*).)  These cases and the authorities on which they rely are part of a "trend in case law . . . to expect more adversarial and criminal-trial-like procedures when"—unlike here—"a student is accused of sexual misconduct and the complainant's credibility is questioned."  (*2021 Regents, supra*, 70 Cal.App.5th at p. 534.)  Crucially for our purposes, these cases expressly limit their holdings to these unique circumstances.  (See *Westmont, supra*, 34 Cal.App.5th at p. 635 [addressing due process rights of a student facing university expulsion based on allegations of sexual misconduct that "turn[ed] on witness credibility"]; *2018 Regents, supra*, 28 Cal.App.5th at p. 60 [in disciplinary proceeding based on allegations of sexual assault, lack of cross-examination of witness claiming to have been assaulted denied student due process based on authority that "when a disciplinary determination turns on the complaining witness's credibility, the accused student is entitled to a process by which the complainant answers his questions"].)  For example, in *Westmont*, the primary authority on which Nofal and Ayach rely, the court addressed "the contours of what a fair hearing requires where . . . the case turns on witness credibility" and concludes that "the college must provide the accused student with the names of witnesses and the facts to which each testifies . . .

15

[citations] [and] [t]he accused must be able to pose questions to the witnesses in some manner, either directly or indirectly." (*Westmont, supra*, 34 Cal.App.5th at p. 635.) These requirements make sense in the context of sexual assault allegations, "because most cases [involving such allegations] turn on credibility (he-said, she-said), [and] the adjudicator or adjudicators must be able to see the parties' testimony and the testimony of important witnesses so their demeanor may be observed." (*Knight v. South Orange Community College District* (2021) 60 Cal.App.5th 854, 866 (*Knight*); see *ibid.* [addressing due process rights of "a student facing suspension or expulsion for nonconsensual sexual activity"].) Thus, the cases Nofal and Ayach cite, and other similar cases, "only impose their additional procedural requirements where the credibility of witnesses is central to the disciplinary decision." (*2021 Regents, supra,* 70 Cal.App.5th at p. 535 [discussing *2018 Regents* and authority on which *Westmont* relies].)

This concern does not apply here. Nofal and Ayach were not accused of sexual misconduct, nor does the adjudication of the allegations against them depend on the credibility of adverse witnesses. There is no material dispute as to the majority of the activities that formed the basis for the charges against Nofal and Ayach—the witnesses' accounts of these activities are largely consistent with Nofal's and Ayach's accounts. Nofal and Ayach did not argue to the committee that these witnesses were lying or were mistaken; rather, they argued that the conduct they were describing—most of which, again, Nofal and Ayach admitted occurred—did not violate university policies or was not a basis for imposing discipline on Nofal and Ayach specifically. Considered in the context of this record, it is clear the charges against Nofal

16

and Ayach did not depend on a credibility contest between the unidentified witnesses and the students accused of the misconduct, as was true in the sexual misconduct cases Nofal and Ayach cite.  (See *2021 Regents, supra*, 70 Cal.App.5th at p. 536 [due process did not require witnesses or complainant to testify live or be subject to cross-examination because the "credibility of witnesses was not central to the [administrative] determination [and] . . . [the student] 'submitted a detailed written response that admitted the essential allegations' of [the] complaint," meaning there was no " 'he-said, she-said' " situation and "the material facts [were] not in dispute"]; accord, *Knight, supra*, 60 Cal.App.5th at p. 870.)  "[L]ive testimony, and the full panoply of trial-like procedures" (*id.* at p. 870) are not required where, as here, "there was no essential dispute about the facts" or the credibility of witnesses (*id* at p. 871).  Thus, that the sexual misconduct cases Nofal and Ayach cite may require a university to disclose the names of witnesses or to present them at a hearing for cross-examination[4] is not a basis for requiring the same procedures for Nofal's and Ayach's hearings.

_____

[4] We use the qualified verb "may" in light of a recent California Supreme Court case holding that cross-examination and confrontation are *not* universally required in *private* (as opposed to public) university disciplinary proceedings regarding sexual misconduct—to which, unlike the instant case, the common law doctrine of fair procedure applies.  (See *Boermeester v. Carry* (2023) 15 Cal.5th 72, 79–80 ["though private universities are required to comply with the common law doctrine of fair procedure by providing accused students with notice of the charges and a meaningful opportunity to be heard, they are not required to provide accused students the opportunity to directly or indirectly cross-examine the accuser and other witnesses at a

17

**B.** *The Committee Hearings Afforded Nofal and Ayach the Full Opportunity To Present Their Defenses That Due Process Requires*

Having concluded that there is no blanket right to cross-examination, confrontation, or witness identity disclosure in *all* student disciplinary proceedings, we must assess the fairness of Ayach's and Nofal's hearings based on whether the hearings gave Nofal and Ayach "a full opportunity to present [their] defenses" (*Andersen, supra*, 22 Cal.App.3d at p. 771) and "the opportunity to characterize [their] conduct and put it in what [they] deem[ ] the proper context." (*Goss, supra*, 419 U.S. at p. 584; see *University of Southern California, supra*, 246 Cal.App.4th at pp. 245–246 ["due process requires 'an "informal give-and-take" between the student and the administrative body dismissing him that would, at least, give the student "the opportunity to characterize his conduct and put it in what he deems the proper context" ' "].) Inherent in this analysis is that the challenged aspects of the hearing—lack of cross-examination, lack of witness confrontation, and the use of pseudonyms in the description of witness statements—prejudiced Nofal's and Ayach's ability to present a meaningful defense.

As noted, the defenses Nofal and Ayach chose to present did not dispute most of the conduct the various unnamed witnesses told SCAIP had occurred. Instead, Nofal and Ayach focused on the significance and consequences of that conduct under university policies. The inability to assess or test the credibility of these witnesses via confrontation and cross-

---

live hearing with the accused student in attendance, either in person or virtually"].)

examination did not restrict Nofal's and Ayach's abilities to present such defenses.

Nor did the University's decision not to identify these witnesses by name or present live testimony at the hearings keep Nofal and Ayach in the dark as to the nature of the witnesses' statements or the details of the conduct they described. SCAIP described this conduct via the master packet and in the notices Nofal and Ayach received before the hearings. Nothing in the record suggests Ayach and Nofal were unclear on what these witnesses said. Nor have they ever disputed that the descriptions of the witness statements they received were somehow incomplete (except in the use of pseudonyms), despite SCAIP inviting Nofal and Ayach to request further information or clarification prior to the hearing. Due process requires an accused student have access to all evidence based on which he is facing discipline because " 'the student [must] first be told what he is accused of doing and what the basis of the accusation is' " in order to be " 'given an opportunity to explain his version of the facts.' " (*University of Southern California, supra*, 246 Cal.App.4th at p. 246, quoting *Goss, supra*, 419 U.S. at p. 582.) Nofal and Ayach do not and cannot claim they were unclear as to what the accusations against them were—particularly when they never sought any clarification in this regard.

Finally, Ayach's and Nofal's statements reflect that they knew the identities of some of the witnesses, yet nothing in the record suggests either attempted to call these individuals to testify nor do they even here contend that any such individual

19

refused to appear.[5]  Nor did Ayach or Nofal request the names of any of the witnesses they did not know, either in response to SCAIP's prompt that Nofal and Ayach could request further information or clarification prior to the hearing, or at any other time before or during the hearing.[6]  This underscores that not speaking with or cross-examining these individuals did not meaningfully limit Nofal's and Ayach's ability to present their

_____

[5] At the hearing before this court, Ayach and Nofal's counsel raised, for the first time, the lack of a subpoena power to assist a UC Riverside student facing discipline in presenting live testimony at a committee hearing.  Even if this argument had been timely raised in Ayach and Nofal's opening brief, it would not assist them.  As noted, nothing in the record suggests Ayach or Nofal attempted to present live testimony of any individual and were unable to do so because that individual refused to testify.  Ayach and Nofal thus cannot establish any prejudice from the lack of a subpoena power.

[6] The case Nofal and Ayach cite for the proposition that they cannot fairly be expected to request the names of the witnesses identified by pseudonyms stands for the distinct (and for Nofal and Ayach unhelpful) proposition that due process requires a student receive evidence being used against him without requesting it.  (See *University of Southern California, supra*, 246 Cal.App.4th at p. 246 ["requiring [student] to request access to the evidence against him does not comply with the requirements of a fair hearing"].)  But Nofal and Ayach received the evidence against them; what they did not receive were the names of witnesses whose statements were described in this evidence, whose identities in some cases they already knew, and whose credibility was not germane to the defenses they mounted.

defenses and put the challenged conduct in context during the committee hearing.[7]

For these reasons, we conclude that the hearings before the committee afforded Nofal and Ayach due process, and find no reversible error in the lower court's denial of their writ petition challenging that hearing.

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.

ROTHSCHILD, P. J.

We concur:

CHANEY, J.

WEINGART, J.

---

[7] Finally, Nofal and Ayach indirectly challenge the legal basis for the University's decision to use pseudonyms for its witnesses.  We do not deem this to be germane to resolving the issues on appeal, given our conclusion that Ayach and Nofal were not denied an opportunity to present a meaningful defense by virtue of UC Riverside using pseudonyms.

Filed 5/28/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CHAD AYACH et al., | B325545 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 21STCP01434) |
| v. | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al., | |
| Defendants and Respondents. | |

THE COURT:

The opinion in the above-entitled matter filed on April 30, 2024 was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____

ROTHSCHILD, P. J.        CHANEY, J.        WEINGART, J.