Filed 4/23/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| JOHN DOE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>WESTMONT COLLEGE,<br><br>    Defendant and Appellant. | 2d Civil No. B287799<br>(Super. Ct. No. 17CV00188)<br>(Santa Barbara County) |

Jane Roe accused John Doe[1] of sexual assault while the two were students at Westmont College. Westmont's Student Conduct Panel (the Panel) determined that the evidence supported Jane's accusation. It suspended John for two years.

John challenged the Panel's decision in a petition for writ of administrative mandate. (Code Civ. Proc.,[2] § 1094.5.) The trial court determined that Westmont did not provide John a fair hearing, and granted his petition. Westmont contends: (1)

---

[1] The parties refer to the individuals involved in this case by pseudonyms. We do the same.

[2] All unlabeled statutory references are to the Code of Civil Procedure.

John received a fair hearing, and (2) substantial evidence supports the Panel's decision.  Because we disagree with Westmont's first contention, we do not reach its second.

Westmont's investigation and adjudication of Jane's accusation was fatally flawed.  Westmont did not provide John with a fair hearing; indeed, it did not comply with its own policies and procedures.  The Panel did not hear testimony from critical witnesses, yet relied on these witnesses' prior statements to corroborate Jane's account or to impeach John's credibility.  The Panel withheld material evidence from John, which its policies required it to turn over.  As a result, John was denied a meaningful opportunity to pose questions to Jane and other witnesses on material disputed facts.  We affirm.

## FACTUAL AND PROCEDURAL HISTORY

### Westmont's sexual assault policies and procedures

Westmont is a small private college located in Montecito.  The college's sexual assault policies and procedures are included in the student handbook.  The handbook defines "Sexual Assault–Category I" as "engaging in sexual intercourse with any person without that person's consent."  It defines "Sexual Assault–Category II" as "the act of making sexual contact with the intimate body part of another person without that person's consent."

When Westmont receives a report of a violation of its sexual assault policy, the Associate Dean for Residence Life begins a preliminary investigation.  The dean meets separately with the alleged victim and accused student, explains the charge(s) and investigation process, and obtains a written statement and list of witnesses from each party.  If the dean

2

determines that the evidence warrants further proceedings, all relevant information is forwarded to the Panel for adjudication.

Members of the Panel include the dean who conducted the investigation and two additional staff members. During the adjudication process, the alleged victim and accused student each has the right to provide witnesses and information about the case, the right to an advisor, and the right to legal counsel. Neither the advisor nor counsel may speak or advocate during the proceedings.

The handbook provides that the parties have the right to confront opposing information. This does not permit them to question witnesses directly, but does allow them to view each other's written statements and all "documents or materials discovered or developed by the investigator during the course of the investigation that [are] provided to the [Panel] as part of the conduct process." The parties also have the right to be "verbally informed . . . of relevant and material[] opposing information communicated by any witness during the conduct meeting."

All parties and witnesses must be given advance notice of Panel meetings. Students are expected, but not required, to meet with the Panel. The Panel meets first with the alleged victim, then the accused student, then any other witnesses the Panel requests. All witnesses must be available for follow-up questioning. After hearing from the witnesses, the Panel may recall the accused for follow-up questions and to make a final statement. The alleged victim then answers follow-up questions and makes a final statement. The meetings are not recorded or transcribed, but a Westmont staff member who does not serve on the Panel may take notes of the Panel's questions, the witnesses' answers, and the parties' final statements.

3

At the conclusion of proceedings, the Panel deliberates privately. It weighs all available information and determines, by a majority vote, "whether it is more likely than not that a sexual assault . . . occurred." It then determines what sanctions, if any, to impose. The chair of the Panel communicates its decision to the alleged victim and the accused student.

Either party may appeal the Panel's decision to the Vice President for Student Life. The vice president first determines whether the appeal demonstrates procedural errors, the availability of new information, or the imposition of excessive sanctions. If it does not, the vice president summarily denies review. If it does, the vice president reviews the Panel's decision. The vice president then either decides the appeal or refers it back to the Panel for resolution.

*Jane's allegations*

On February 1, 2016, Jane's mother reported to Westmont that her daughter had been raped at an off-campus party two weeks earlier. The Associate Dean for Resident Life, Stu Cleek, began a preliminary investigation. Jane told Cleek that she went to a party around 10:30 p.m. on January 15. Thirty to 40 people were there, including her roommates, M.H. and M.W. Jane believed M.H. and M.W. were intoxicated. Jane said she did not drink alcohol that night.

John was also at the party. Jane told Cleek that she went out to the backyard around 10:45 p.m. and saw John sitting with a group of people. John had a beer and one or two small jars of marijuana. Jane went back inside.

When Jane rejoined the group around 11:00 or 11:15 p.m., John packed a pipe with marijuana and passed it around

4

the group.  John said that since it was his marijuana, Jane had to kiss him each time she took a hit.  Jane thought John was joking and did not kiss him.  She took seven or eight hits off the pipe, and felt "very giggly and super sleepy."

Once everyone else went inside, John asked Jane if she wanted to go for a walk and continue smoking marijuana.  The two left the backyard between 11:30 and 11:40 p.m.  After they had passed by one house, John grabbed Jane and kissed her.  Jane told John she did not want to kiss him.  She believed he was "pretty wasted" based on his slurred speech, half-closed eyes, and unstable gait.

John said he wanted to have sex.  When they had walked past two or three more houses, John grabbed at Jane's pants.  Jane told him to stop.  John said, "I want to have sex with you."  Jane replied that she did not want to have sex.  John said that it would be "really quick."  He then reached inside Jane's pants and put his finger in her vagina.  Jane grabbed John's arm and again told him to stop.  John replied, "I want to do this." Jane believed John would not stop no matter how many times she asked.

Jane told Cleek that John then turned her around, pulled down her pants, and told her to get on her knees.  When she did, John put his penis inside her vagina.  Jane estimated the penetration lasted 45 seconds to one minute.  Afterward, John told Jane not to tell anyone what happened.  "If anyone asks, deny, deny, deny everything."

As they walked back to the party, John told Jane to enter the house through a different entrance than he used.  He went inside through the back gate, Jane through the front door.  The two did not speak the rest of the night.

Once inside, Jane told M.H. that she had had sex with John. Jane asked M.H. not to tell M.W. Jane said she knew that John and M.W. had "hooked up" previously and that M.W. "continued to have feelings" for him.

Jane left the party and returned to Westmont between 12:50 and 1:00 a.m. M.H. and M.W. were in her room when she got home. M.W. was upset and asked Jane about the incident with John. Jane said, "I am so sorry. I don't know what I was thinking. I told him 'no.' I didn't want to do it."

*John's response*

John denied Jane's allegations. He said he never had sex with Jane and was never alone with her. He did not have her phone number, and had no contact with her over social media.

John said he arrived at the January 15 party around 9:45 p.m. with his friends C.B. and M.M. About 30 other people, including his friends J.E. and N.K., were already there. John did not drink alcohol that evening and did not smoke marijuana.[3] He did not take marijuana to the party.

After about an hour, John went out to the backyard with J.E., M.M., and another friend, M.C. John saw Jane standing with a group of people outside. He did not see Jane smoke marijuana, but did see her drink tequila. Both M.H. and M.W. told John that Jane was drunk. John said M.H. and M.W. also consumed alcohol. M.M. did not.

After 20 or 30 minutes in the backyard, John went inside with M.M. to use the bathroom. He then returned to the

---

[3] John told Cleek that he had consumed alcohol and smoked marijuana on other occasions, but not since he arrived at Westmont.

backyard.  M.H., M.W., and Jane went back in the house.  John did not see Jane again that night.

M.W. later returned to the backyard and asked John if he had had sex with Jane.  He laughed and said he had not.  M.W. said Jane was telling people otherwise.  John was annoyed that Jane would tell people that they had sex.  K.S. and M.B. were nearby during John's interaction with M.W.  J.E. and M.M. may have also been present.

Later, M.H. asked John if he had sex with Jane.  He replied, "[T]hat's not fucking funny, stop saying that."  M.W. sent a text message asking the same thing, which John again denied.  John left the party around 12:15 a.m.

John told Cleek that he spoke with M.H., M.W., and Jane's other roommate, K.B., a few days later.  They told him that Jane was telling people that she did not have sex with John, or that they had consensual sex, or that John took advantage of her.  John did not ask Jane about the rumors because he did not have her contact information.

Cleek asked John why Jane would spread rumors about sex that had not occurred.  John said he believed it was because he ignored a text message Jane sent asking him to go to the beach to "hook up."  John said he showed the message to J.E. before he deleted it.

*Witness statements*

Both Jane and John identified K.B., M.H., and M.W. as witnesses.  Jane also identified another friend she told about the incident the day after the party, B.R.  John identified J.E., M.B., M.M., and K.S.

K.B. told Cleek she was asleep when M.H. and M.W. arrived home after the party.  M.H. said that Jane told her that

7

she kissed and had sex with John.  When Jane arrived home, she "started blaming what happened on her having mental health issues."  Jane also said she had been drinking.  Later, M.H. and M.W. told K.B. that Jane commented that "the sex [with John] wasn't that good."  K.B. thought Jane's "behavior ha[d] been 'off'" in the weeks prior to the party, and that she had "engaged in a lot of lying[,] even in little things [that] don't matter."

M.H. told Cleek she was Jane's close friend and roommate.  She arrived at the party with M.W. between 9:00 and 9:30 p.m.  She briefly spoke with John, but did not interact with him outside.  She said Jane arrived at the party around 10:30 p.m.  She appeared to be under the influence.  About a half-hour later, Jane told M.H. that she had "done something really bad" and kissed John.  Ten minutes later, Jane told M.H. that she had "d[one] something worse.  [She] had sex with [John]."  M.H. told M.W. what Jane said.  M.W. became upset.  M.H. and M.W. left the party.

When Cleek asked, M.H. did not recall confronting John at the party about having sex with Jane.  She told Cleek that Jane is a "compulsive liar" and that she "wouldn't believe anything she says."  M.H. denied drinking at the party.

M.H. told Cleek that she and M.W. told K.B. what happened after the party.  When Jane got home, she apologized and said, "You know I make bad decisions when I'm drunk."  M.H. later heard Jane tell M.W., "[I]f it makes you feel better, he wasn't any good."  M.H. believed Jane had consensual sex with John.

M.W. told Cleek she "was one of [Jane's] best friends prior to the alleged incident."  M.W. arrived at the party around 9:45 p.m. and spent most of the night inside with M.H.  After

Jane arrived around 10:30 p.m., she went to the backyard with M.H.  Jane and John were both smoking marijuana.

M.W. went inside with M.H.  Fifteen to 30 minutes later, Jane came in and told M.H. she had sex with John.  M.H. told M.W.  M.W. asked John, and he laughed and said he did not have sex with Jane.  M.W. did not know who to believe.  She was upset and left the party with M.H.  Neither she nor M.H. consumed alcohol that evening.

When they got home, M.H. and M.W. told K.B. what had happened.  Jane arrived later and apologized to M.W.  She said that she "acts on impulse when she is drunk[] and that she had really been having a hard time with depression and anxiety and her medications."  M.H. yelled at Jane for blaming her behavior on her mental health or intoxication.  She said Jane needed to take responsibility for her actions.

A few days later, Jane apologized again to M.W. for having sex with John.  She told M.W. she "had sex in a front yard down the street" with John when they went to smoke marijuana.  Jane did not mention that she asked John to stop or that she did not want to have sex with him.  If she had, M.W. would have responded differently.

B.R. told Cleek she is Jane's "really close friend."  She was not at the party, but talked to Jane the next day.  Jane told B.R. that she and John were smoking marijuana at the party and were both "cross faded."  John suggested that they go for a walk. During their walk, they had sex.  Jane said she didn't want to do anything because of John's previous relationship with M.W.  She said she asked M.H. not tell M.W. that she had sex with John.

B.R. said that Jane later told her that she had been raped.  It was only after M.W. told her to move out that Jane said

9

that. B.R. was surprised by Jane's allegation. She noted that Jane originally said that she was drunk the night of the alleged incident, but later said she clearly remembered that she was raped. B.R. spoke with M.H., who said Jane had "boast[ed] about how she had sex with [John]" during the party. M.W. and M.H. told B.R. they did not believe Jane and John had sex.

J.E. is John's roommate and "very good friend." J.E. told Cleek that he arrived at the party around 10:00 or 10:30 p.m. and was with John in the backyard for the next hour and a half. At some point Jane approached John and then went back inside. John told J.E. that he had received a text message from Jane earlier in the evening inviting him to have sex with her, but J.E. did not see it.

J.E. did not hear John mention any sexual interaction with Jane. He did not remember Jane and John being alone together at the party. He did not see either Jane or John consume alcohol or smoke marijuana.

M.B. told Cleek that he is John's "really good friend." He and John were together at the party "pretty much . . . the whole time." At one point he saw John back away when Jane tried to kiss him. Later, he heard M.W. ask John if he liked Jane. John said he did not. M.B. did not hear if M.W. asked John if he had sex with Jane. He said no one in their group drank alcohol or smoked marijuana that evening.

M.M. is John's "pretty good friend." M.M. told Cleek he was with John the "entire night of the party." He saw John interact with Jane, M.H., and M.W. for a few minutes in the backyard. He did not recall whether M.W. asked if Jane and John had sex. He said neither he nor John consumed alcohol or smoked marijuana that night.

K.S. told Cleek that she arrived at the party around 10:00 p.m.  She was outside with John when Jane approached them "wobbly and unsteady."  Jane "appeared to have been drinking by her behavior."  She stayed outside for about 10 minutes before she went back into the house.  K.S. did not see John with M.B. or M.M. at the party.

*The conduct meeting and subsequent appeal*

Cleek completed his preliminary investigation and determined that the information warranted a student conduct meeting.  He compiled all notices, summaries of witness statements and interviews, and other documentary evidence, and provided copies to Jane, John, and his fellow Panel members.  The summaries omitted some of Cleek's questions and witnesses' answers.  Jane and John were allowed to submit statements that addressed the evidence packages they received.

At its first meeting, the Panel interviewed Jane.  A Westmont staff member who did not serve on the Panel took detailed notes of the Panel's questions and Jane's responses, a procedure replicated with all subsequent witnesses.  Jane also gave the Panel a written statement.

The Panel then interviewed John.  It provided John and his attorney with Jane's written statement and an oral summary of what was said during her interview.  John submitted additional documents.

The Panel interviewed B.R., C.B., J.E., M.B., and M.M., and a sixth witness, S.M.  Despite John's request, the Panel did not interview K.B., K.S., M.H., or M.W.  The Panel recalled Jane twice and John once.  During these follow-up sessions, the Panel asked some questions Jane and John had suggested.  It also provided them with oral summaries of other

11

witnesses' testimony.  After hearing these summaries, John alleged several errors in the witnesses' testimony.  He submitted additional documents at the meeting, and later e-mailed several additional points.  The Panel did not accept the additional information John e-mailed after the meeting.

The Panel found that a preponderance of the evidence showed that John committed Sexual Assault–Category I when he inserted his finger and penis into Jane's vagina, and Sexual Assault–Category II when he touched Jane's vagina.  The Panel based its decision on Jane's account of the incident, which it deemed credible and consistent throughout the proceedings.  It also found corroboration for Jane's account:  M.H. said Jane told her that she and John engaged in sexual activity.  M.H. also told that information to M.W., who said she confronted John about it later at the party.

The Panel concluded that Jane's initial reluctance to refer to the incident with John as "rape" or "sexual assault" did not render her account incredible.  Victims often feel shame after an assault, and may even take responsibility for it.  And as evidenced by her request to M.H. to not tell M.W. about what had happened, Jane was concerned about how the incident might impact her relationship with M.W.

The Panel did not find John credible.  When M.W. asked him about his encounter with Jane after hearing about it from M.H., John did not tell M.W. that he could not have had sex with Jane because they were never alone.  John did not dispute the timeline Jane provided, which showed a window where the two could have been alone together.  Nor did he confront Jane about her statements that they had engaged in sexual activity.

12

Moreover, John's witnesses did not corroborate his account of the evening. J.E. was not with John during the entire party. He did not see a text message in which Jane allegedly asked John to "hook up." He said that John only spoke about that message after his meeting with Cleek.

M.M.'s statement that he was with John during the entire party was not believable. K.S. saw both of them at the party, but did not see them together. M.M. was also unaware that M.W. asked John about having sex with Jane while they were at the party, even though they were purportedly together.

Finally, John's denials of having a sexual encounter with Jane were inconsistent. Initially he said he did not want to ruin his relationship with his girlfriend. Later he said he and Jane were never alone.

The Panel suspended John through the end of the spring 2018 semester. John appealed, alleging procedural errors and excessive sanctions. The Vice President for Student Life summarily denied John's appeal.

*Trial court proceedings*

John challenged the Panel's decision in a petition for writ of administrative mandate. He claimed Westmont did not provide a fair hearing and substantial evidence did not support the Panel's decision.

The trial court granted John's petition, concluding that Westmont denied him a fair hearing. The Panel had access to more information bearing on witness credibility than was provided to John, especially with respect to those witnesses interviewed by Cleek who did not testify. The Panel did not give John the notes recording the Panel's questions and witnesses' responses, impeding his ability to respond to the evidence against

13

him.  And John had no ability to question the details of witnesses' testimony, even indirectly.

The trial court did not reach the issue of whether substantial evidence supported the Panel's substantive decision. It ordered the Panel to set aside its decision and vacate the sanctions imposed.  It ordered Westmont to conduct a new hearing in which John could "hear the evidence presented against him in some appropriate manner that [John] would be able adequately to respond," and to "permit [John] to participate, at least indirectly, in the questioning of witnesses."  It also barred Cleek from participating as an adjudicator.

## DISCUSSION

### *Scope and standard of review*

If a private college has a procedure for conducting sexual misconduct disciplinary proceedings, an accused student may challenge the outcome of the proceedings in a petition for writ of administrative mandate.  (*Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 237, fn. 9 (*USC I*); see § 1094.5.)  The scope of our review from the judgment on the petition is the same as that of the trial court.  (*USC I*, at p. 239.) We review the adjudicatory body's decision directly, and independently determine whether the college provided the accused with a fair hearing.  (*Ibid.*; see § 1094.5, subd. (b).)

### *Fair hearing standards*

A college's procedure for investigating and adjudicating student sexual misconduct allegations is not analogous to a criminal proceeding.  (*Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1078 (*UCSD*).)  The college must nevertheless give the accused student notice of the allegations against them and a fair hearing at which they may

14

attempt to rebut those allegations.  (*USC I, supra*, 246 Cal.App.4th at p. 240.)  The common law requirements for a fair hearing at a private college "mirror the due process protections at public universities."  (*Doe v. Allee* (2019) 30 Cal.App.5th 1036, 1061 (*Allee*).)  These requirements are "'flexible' and entail no 'rigid procedure.'"  (*Id.* at p. 1062.)

A fair hearing strives to balance three competing interests:  The accused student seeks ""to avoid unfair or mistaken exclusion from the educational process."""  (*Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055, 1066 (*CMC*).)  The college tries to provide a safe environment for all of its students.  (*Allee, supra*, 30 Cal.App.5th at p. 1063.)  The alleged victim—who often "'lives, works, and studies on a shared college campus'" with the accused—wants to safeguard their own well-being.  (*CMC*, at p. 1066, alterations omitted.)

These competing interests "must be addressed in light of the nature of a [college] and the limits of its resources." (*Allee, supra*, 30 Cal.App.5th at p. 1063.)  A college's primary purpose is education.  (*UCSD, supra*, 5 Cal.App.5th at p. 1078.) Hearing requirements that are too formal and rigid divert resources and attention from that purpose.  (*Ibid.*)  Accordingly, "all the safeguards and formalities of a criminal trial" are not required.  (*Ibid.*)  "'Although [a college] must treat students fairly, it is not required to convert its classrooms into courtrooms.' [Citation.]"  (*Ibid.*)

"[N]o particular form of student disciplinary hearing is required under California law."  (*UCSD, supra*, 5 Cal.App.5th at p. 1078.)  Recent cases have described the contours of what a fair hearing requires where, as here, the case turns on witness credibility:  At a minimum, the college must comply with its own

15

policies and procedures.  (*Ibid*.)  Those procedures must provide the accused student with a hearing before a neutral adjudicatory body.  (*Allee*, *supra*, 30 Cal.App.5th at p. 1069.)  The accused must be permitted to respond to the evidence against them.  (*Id.* at p. 1062; *Doe v. Regents of University of California* (2018) 28 Cal.App.5th 44, 57-59 (*UCSB*); *USC I*, *supra*, 246 Cal.App.4th at p. 246.)  The alleged victim and other critical witnesses must appear before the adjudicatory body in some form—in person, by video conference, or by some other means—so the body can observe their demeanor.  (*Allee*, at p. 1069; *Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212, 1232-1237 (*USC II*); *CMC*, *supra*, 25 Cal.App.5th at pp. 1070-1073.)  This is because "'the opportunity to question a witness and observe [their] demeanor while being questioned can be just as important to the trier of fact as it is to the accused.' [Citation.]"  (*CMC*, at p. 1069.)  "Recognizing the risk that an accusing witness may suffer trauma if personally confronted by an alleged assailant at a hearing, [the *USC I* court observed] that mechanisms can readily be fashioned to 'provid[e] accused students with the opportunity to hear the evidence being presented against them without subjecting alleged victims to direct cross-examination by the accused.' [Citation.]"  (*Allee*, at p. 1066.)  It is not necessary to place the alleged victim and the accused in the same room.  (*CMC*, at p. 1073.)

The college must provide the accused student with the names of witnesses and the facts to which each testifies.  (*UCSB*, *supra*, 28 Cal.App.5th at pp. 57-59; *UCSD*, *supra*, 5 Cal.App.5th at pp. 1102-1103; *USC I*, *supra*, 246 Cal.App.4th at pp. 247-248.)  The accused must be able to pose questions to the witnesses in some manner, either directly or indirectly, such as

16

through the adjudicatory body. (*Allee, supra*, 30 Cal.App.5th at p. 1069; *USC II, supra*, 29 Cal.App.5th at pp. 1237-1238; *UCSB*, at pp. 57, 60; *CMC, supra*, 25 Cal.App.5th at p. 1070; *UCSD*, at p. 1084.) The body need not ask every question proposed by the accused. (*CMC*, at p. 1073.)

*The Panel denied John a fair hearing*

The procedure Westmont employed here violated its own internal policies and denied John the opportunity to fully respond to the evidence against him. First, the Panel did not hear testimony from three critical witnesses—K.S., M.H., and M.W.—yet it relied on portions of their statements to corroborate Jane's account or to impeach the credibility of John and his supporting witnesses. Second, the information and documents the Panel disseminated—Cleek's investigative reports and oral summaries of witness testimony—did not adequately appraise John of the evidence against him. Finally, John had little opportunity to pose questions for Jane or other witnesses because the Panel withheld information from him and did not recall witnesses for follow-up questions.

*1. Critical witnesses*

"'Oral testimony of witnesses given in the presence of [an adjudicatory body] is valued for its probative worth on the issue of credibility, because such testimony affords the [body] an opportunity to observe the demeanor of witnesses.' [Citation.]" (*USC II, supra*, 29 Cal.App.5th at p. 1233.) Thus, ""'some form of presence'"" is required to enable the body to determine whether a witness is ""'worthy of belief.'" [Citation.]" (*CMC, supra*, 25 Cal.App.5th at p. 1069.) This is especially true where, as here, "there is no corroborating physical evidence to assist the [body] in resolving conflicting accounts." (*USC II*, at p. 1234.)

17

Here, the Panel relied on K.S.'s statement to Cleek that she did not see John and M.M. together at the party to refute M.M.'s testimony that he was with John the entire evening. It relied on M.H.'s statement to Cleek that Jane told her of the alleged sexual encounter with John to bolster Jane's testimony that the encounter occurred. It relied on M.W.'s statement to Cleek that she confronted John about the alleged encounter at the party to highlight John's failure to tell her he was never alone with Jane. It also relied on M.W.'s statement to refute M.M.'s testimony, concluding that he would have overheard M.W. confront John if he were with him the entire evening. Why the Panel deemed the nontestifying witnesses more credible than their testifying counterparts—without observing their demeanor—is not clear from the record.

Nor is it clear why the Panel relied on selected portions of the nontestifying witnesses' statements while rejecting or ignoring other portions. For example, despite crediting other portions of their statements, the Panel apparently rejected K.S.'s, M.H.'s, and M.W.'s statements that Jane appeared to have been under the influence of alcohol at the party—statements that contradicted Jane's testimony. We highlight these portions of the nontestifying witnesses' statements not to impugn Jane's credibility or discredit her accusation, but to underscore the seemingly arbitrary method by which the Panel selected which nontestifying witnesses' statements it deemed credible—despite its members' inability to observe these witnesses to assess their credibility on disputed factual issues.

Cleek's dual roles as an investigator and adjudicator compounds our concerns with the Panel's credibility

18

determinations. "'[T]he combination of investigative and adjudicative functions does not, without more,'" deprive a student accused of sexual misconduct of a fair hearing. (*USC II*, *supra*, 29 Cal.App.5th at p. 1235, fn. 29.) But where critical witnesses provide inconsistent accounts of an alleged incident, independent evaluation of witness credibility is "pivotal to a fair adjudication." (*Allee*, *supra*, 30 Cal.App.5th at p. 1069.)

Here, all three Panel members were finders of fact. All three were thus required to hear from critical witnesses before choosing to credit certain accounts over others. (*CMC*, *supra*, 25 Cal.App.5th at pp. 1072-1073.) That did not happen. Instead, it appears that the Panel "simply approve[d] the credibility determinations of one [Panel] member who was also the investigator"—Cleek. (*Id.* at p. 1073.)

We conclude that the Panel deprived John of a fair hearing when it credited certain portions of nontestifying witnesses' statements based solely on Cleek's investigative reports. (*CMC*, *supra*, 25 Cal.App.5th at pp. 1072-1073.) Which parts of the nontestifying witnesses' statements are more worthy of belief than other parts and which of those witnesses are more worthy of belief than those who testify cannot be determined on a cold record. (*Fitch v. Commission on Judicial Performance* (1995) 9 Cal.4th 552, 556 [noting difficulties in evaluating witness credibility on a cold record].) Rather, each adjudicator must hear from critical witnesses—in person, by videoconference, or by some other method—before assessing credibility. (*USC II*, *supra*, 29 Cal.App.5th at pp. 1232-1237.) That principle was violated here.

### 2. *Information provided to John*

"There is no formal right to discovery in student conduct review hearings." (*UCSD*, *supra*, 5 Cal.App.5th at p.

19

1095.)  But Westmont's sexual assault policies and procedures required it to turn over Cleek's interview notes.  The policies permitted John to access *all* evidence Cleek discovered or developed during his investigation, yet Cleek omitted some of his questions and the witnesses' answers from his reports.  This limited the scope of questions John could propose for the witnesses.  Cleek, in contrast, knew the full scope of information available from the witnesses.  That enabled him—and through him, the Panel—to assess credibility based on a fuller array of information than was available to John.  Those credibility determinations were especially significant here, where multiple witnesses contradicted each other on material points.

John's information deficit grew as the student conduct meeting progressed.  A Westmont staff member took detailed notes that recorded the Panel's questions and witnesses' responses, but the Panel did not provide these to John.  Instead, it gave John oral summaries which were significantly less detailed than the recorded notes, restricting his ability to respond to the testimony and propose follow-up questions for Jane and other witnesses.

Fair hearing requirements "do not allow [a college's adjudicatory body] to rely on evidence that has never been revealed to the accused" student when it assesses witness credibility.  (*USC I*, *supra*, 246 Cal.App.4th at p. 247.)  But the Panel did just that.  It had access to Cleek's interviews and the more detailed notes of witnesses' testimony, neither of which was made available to John.  That information imbalance hindered John's ability to respond to the evidence against him.

We do not suggest that the Panel was required to record witness testimony verbatim or permit John's presence

20

during the testimony; "there are alternate ways of providing accused students with the opportunity to hear the evidence being presented against them." (*USC I*, *supra*, 246 Cal.App.4th at p. 245, fn. 12.) Nor do we believe that fairness principles absolutely bar Cleek from serving on the Panel. (*USC II*, *supra*, 29 Cal.App.5th at p. 1235, fn. 29; see *CMC*, *supra*, 25 Cal.App.5th at pp. 1072-1073 [impliedly approving the investigator serving as one of several adjudicators].) We simply hold that where the outcome of a sexual misconduct disciplinary proceeding turns on witness credibility, an adjudicatory body cannot base its credibility determinations on information in its possession that is not made available to the accused. (*UCSB*, *supra*, 28 Cal.App.5th at p. 59.)

### 3. *Opportunity to question witnesses*

A student accused of sexual misconduct is not entitled to directly cross-examine the alleged victim or other witnesses who testify at a sexual misconduct hearing. (*UCSD*, *supra*, 5 Cal.App.5th at p. 1084; *USC I*, *supra*, 246 Cal.App.4th at p. 245.) Cross-examination is "fraught with potential drawbacks," including traumatizing or intimidating the alleged victim and "'escalating or perpetuating a hostile environment.' [Citation.]" (*USC I*, at p. 245, fn. omitted.) Nevertheless, where a college's decision hinges on witness credibility, the accused must be permitted to pose questions to the alleged victim and other witnesses, even if indirectly. (*Allee*, *supra*, 30 Cal.App.5th at p. 1066; *USC II*, *supra*, 29 Cal.App.5th at p. 1237; *CMC*, *supra*, 25 Cal.App.5th at p. 1070; *UCSD*, at p. 1084.)

The Panel denied John that right. First, John could not propose questions for certain critical witnesses relied on by the Panel for its decision because they did not testify at the

21

conduct meeting.  (See *Allee, supra*, 30 Cal.App.5th at p. 1066 [right to question witnesses other than alleged victim].)  Second, John was unable to challenge the discrepancies he saw in the testifying witnesses' responses to the Panel's questions.  (*Ibid*.) None of them, other than Jane, was recalled—notwithstanding Westmont's policy requiring witnesses to submit to follow-up questions.  And third, as set forth above, John did not have access to Cleek's interview notes or the notes taken during witnesses' testimony—notwithstanding Westmont's policy providing for access to all evidence Cleek discovered during the investigation. That impeded John's ability to suggest questions that may have impacted the Panel's credibility determinations.  (*UCSB, supra*, 28 Cal.App.5th at p. 58.)

If Westmont proceeds with a new disciplinary proceeding, it must:  (1) allow John to access Cleek's notes, as required by its policies and procedures; (2) provide him with any notes recording the Panel's questions and witnesses' responses during the student conduct meeting; and then (3) either permit him to submit a list of questions for the witnesses (*USC II, supra*, 29 Cal.App.5th at p. 1238; *UCSD, supra*, 5 Cal.App.5th at p. 1085) or fashion some other mechanism for him to suggest questions the Panel can ask (*Allee, supra*, 30 Cal.App.5th at p. 1069; *CMC, supra*, 25 Cal.App.5th at p. 1070).  This does not require Westmont to allow John, his attorney, or his advisor to cross-examine Jane or any other witness directly.  (*Allee*, at p. 1066 [highlighting alternative mechanisms]; *CMC*, at p. 1070 [same]; *USC I, supra*, 246 Cal.App.4th at p. 245, fn. 12 [same].) Nor does it require the Panel to ask all of the questions John suggests.  (*CMC*, at p. 1073 [the Panel may "exclude or rephrase questions as appropriate and ask its own questions"].)  Fairness

22

simply requires John's material participation in submitting proposals for the questioning of critical witnesses.

*Conclusion*

We are mindful that sexual assaults are prevalent on college campuses, and that many victims are reluctant to report those assaults to college officials. (See, e.g., Behre, *Ensuring Choice and Voice for Campus Sexual Assault Victims: A Call for Victims' Attorneys* (2017) 65 Drake L.Rev. 293, 316-319; DeMatteo et al., *Sexual Assault on College Campuses: A 50-State Survey of Criminal Sexual Assault Statutes and Their Relevance to Campus Sexual Assault* (2015) 21 Psych. Pub. Pol. & L. 227, 228-229.) And burdensome hearing processes can ""'divert both resources and attention from a university's main calling, that is education. Although a university must treat students fairly, it is not required to convert its classrooms into courtrooms.'" [Citation.]" (*CMC*, *supra*, 25 Cal.App.5th at p. 1066.)

Like our colleagues in Division One, "we do not wish to limit the universe of ideas on how to accomplish" fair hearings to accommodate the competing interests of accused students, victims, and colleges. (*CMC*, *supra*, 25 Cal.App.5th at p. 1073.) But compelling colleges to adhere to basic principles of fair hearings—and their own written policies—will lead to an increasing number of decisions upheld by the courts—particularly when the required procedures are not "excessively burdensome." (*Ibid*.) That benefits students accused of sexual misconduct, victims, and colleges alike.

DISPOSITION

The judgment setting aside Westmont's determination and sanctions against John and directing Westmont to conduct further proceedings is affirmed. Cleek shall

23

not be prohibited from acting as an adjudicator so long as John is provided with fair hearing proceedings consistent with the views expressed herein.  John Doe shall recover his costs on appeal.

<u>CERTIFIED FOR PUBLICATION.</u>

TANGEMAN, J.

We concur:

GILBERT, P. J.

PERREN, J.

Thomas Pearce Anderle, Judge

Superior Court County of Santa Barbara

_____

Musick, Peeler & Garrett and Adam L. Johnson, for Defendant and Appellant.

Hathaway Parker, Mark M. Hathaway and Jenna E. Parker, Plaintiff and Respondent.