Filed 8/29/22  Doe v. White CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| JOHN DOE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>TIMOTHY P. WHITE et al.,<br><br>    Defendants and Respondents. | 2d Civil No. B313836<br>(Super. Ct. No. 20CV-0418)<br>(San Luis Obispo County) |

Jane Roe accused John Doe of sexual misconduct while the two were students at California Polytechnic State University–San Luis Obispo (CalPoly).  A hearing officer determined that the evidence supported Jane's accusation, and recommended John's expulsion.  CalPoly administrators agreed with the recommendation and expelled John.

John challenged CalPoly's decision in a petition for writ of administrative mandate (Code Civ. Proc., § 1094.5), arguing that he did not receive a fair hearing and that substantial evidence did not support the hearing officer's findings.  The trial court denied John's petition.  On appeal from the judgment, John

contends: (1) CalPoly did not abide by its policies and procedures for adjudicating sexual misconduct allegations, (2) he did not receive a fair hearing, (3) substantial evidence does not support the hearing officer's findings, and (4) expulsion was an overly harsh sanction. We affirm.

FACTUAL AND PROCEDURAL HISTORY

*CalPoly's sexual misconduct policies and procedures*

In 2016, California State University (CalState) adopted Executive Order 1097 (2016 E.O. 1097). It sets forth the policies and procedures CalPoly employs to investigate and adjudicate sexual misconduct allegations. The substantive policy provisions of 2016 E.O. 1097 prohibit sexual misconduct of any kind. Engaging in sexual activity without obtaining affirmative consent constitutes sexual misconduct.

2016 E.O. 1097 defines "affirmative consent" as an "informed, affirmative, conscious, voluntary, and mutual agreement to engage in sexual activity." Silence does not constitute affirmative consent. A person who cannot understand the fact or nature of sexual activity because they are under the influence of drugs or alcohol cannot provide affirmative consent. A belief that the other person consented to sexual activity does not excuse sexual misconduct unless the student took reasonable steps to determine that the other person affirmatively consented.

CalState officials revised Executive Order 1097 in 2019 (2019 E.O. 1097). Under the revised order, sexual misconduct is determined under the substantive policy in effect at the time of the incident. The procedures set out in 2019 E.O. 1097 are still used to resolve the complaint.

If CalPoly officials receive a sexual misconduct complaint, 2019 E.O. 1097 requires an investigation, which may result in a

hearing.  A hearing officer must apply the preponderance of the evidence standard to determine whether the accused student committed sexual misconduct.  If a violation is found, the officer proposes an appropriate sanction, which is sent to the president of CalPoly.

The parties are notified of the hearing officer's decision and proposed sanction, and informed of their rights to appeal.  A party may appeal the decision on the grounds that the decision is not supported by the evidence, that procedural errors affected the outcome of the hearing, or that there is new evidence, not reasonably available at the time of the hearing, that would have affected the decision.  A party may appeal a sanction as an abuse of discretion.

*Jane accuses John of sexual misconduct*

Jane filed a complaint alleging that John had engaged in sexual intercourse with her without her affirmative consent. Jane told the investigator that she took an Uber to a bar crawl in downtown San Luis Obispo around 7:00 a.m. on March 17, 2018. Before leaving she took medication and drank four or five shots of vodka mixed with cranberry juice.  She recalled arriving downtown, but then blacked out.  She went home about 30 minutes later.

Later that morning, John knocked on the door to Jane's apartment.  Jane drank two shots of vodka and a beer with John. She then blacked out again.

Jane woke up around 5:00 a.m. the next day.  She had cuts on her face and bruises on her neck.  She had vaginal pain and was not wearing underwear.  She sent text messages to her mother and a friend, M.K., describing what she remembered from the previous day.  She also sent them pictures of her injuries.

3

Jane went to the hospital and told the staff that she had been sexually assaulted. A police officer arrived and escorted her to a sexual assault response team (SART) exam. Jane told the officer that she thought that a person who had been stalking her (not John Doe) might have assaulted her.

After police told Jane that her alleged stalker had not assaulted her, Jane sent a text message to John: "I'm still trying to piece together what happened to me on St. Patrick's Day[.] Could you tell me what you remember?" When the two met in person, John told Jane that they had had sex.

The next day, John and Jane exchanged a series of text messages:

"John: How are you feeling?

"Jane: Not well. That wasn't ok. I was way too gone to consent that should have been clear.

"John: I understand that and I never meant to do that. I was way beyond any ability to make good decisions and I am sorry. I messed up, is there any way I can help make it right?

"Jane: No. You fucked up big time.

"John: You are right I screwed up royally.

"Jane: It was sexual assault. You do understand that right?

"John: Yes, I very much understand that it was sexual assault. I was about to ask if I could call you to ask you something. It will probably save a massive amount of time

4

rather than letting this drag out any longer than it already has."

*John denies Jane's allegations*

John, accompanied by an attorney advisor, met with the investigator in November. At the meeting, John said that he would only make a statement and would not answer any questions.

John denied that he had sexual intercourse with Jane without her consent and denied that he bruised her face and neck. He said that he went to Jane's apartment at approximately 11:15 a.m. on March 17. When Jane opened the door, she had a bloody nose and cut lip. She said someone had hit her at the bar crawl she had attended earlier that morning.

John told the investigator that he was following the training he received at CalPoly's disability resource center (DRC) when he replied to Jane's text messages about the alleged incident. His training taught him the value of sympathizing with and affirming a victim's feelings.

John said that he had no witnesses to present because no one other than he and Jane witnessed their interactions on March 17.

*Additional witness interviews*

The investigator interviewed three additional witnesses: R.T., Jane's then-roommate; L.I., Jane's friend; and D.H., the director of the CalPoly DRC.

R.T. did not recall much about March 17. She only remembered that Jane told her that she was trying to keep someone out of their apartment.

L.I. said that she received a picture of Jane covered in bruises on March 18. Jane was "'freaked out'" and thought she

5

had been raped. The last thing Jane said she remembered was drinking a shot of vodka with John at her apartment.

D.H. told the investigator "that the DRC did not have [a] specified protocol or guidelines for 'student[-]on[-]student]' interactions." But "when presented with a student in emotional distress, their process would be to affirm the student's feelings, de-escalate the situation, make sure the student [feels] safe, and then coordinate with appropriate resources to ensure that the student receive[s] accommodations and/or counseling, if needed."

*The investigator's reports*

In January 2019, the investigator sent Jane and John a preliminary report identifying the evidence that had been gathered. The report noted that Jane had texted her mother and M.K. after the alleged incident with John, but the investigator concluded it was not necessary to interview either of them because neither witnessed the incident. Additionally, the investigator interviewed L.I., who spoke to Jane around the same time Jane reached out to her mother and M.K.

The preliminary report said that Jane had copies of her SART exam and police report. The investigator told Jane that they would need to be provided to John if they were to be considered in the investigation. Jane elected not to have the investigator consider them.

The investigator's report included copies of the first six pages of the 12-page summary of Jane's hospital visit. Jane said that she did not have the remaining six pages. She believed those pages contained only follow-up instructions.

The investigator told Jane and John that they could provide written responses to the preliminary report or meet with her to discuss it. She also said that they could propose questions

for each other.  Both parties opted to meet with the investigator in person.

During her meeting with the investigator, Jane did not offer additional information, but did propose questions for John. John similarly did not offer any additional information, but did respond to some of Jane's questions: He said that no one else was present when he arrived at Jane's apartment.  Jane appeared happy to see him.  He knew that Jane had been drinking from text messages she had sent, but he did not know how much.  He and Jane talked and drank alcohol until Jane fell asleep around 3:00 p.m.  Jane woke up about two hours later and escorted John out of her apartment.

John refused to answer questions about any sexual activity with Jane.  He did not propose any questions for Jane, and did not ask the investigator to interview additional witnesses or obtain additional evidence.

In April, the investigator told Jane and John that CalState had recently adopted 2019 E.O. 1097 and that CalPoly's investigation would proceed under the new policies and procedures.  She provided them with copies of the new procedures.  The investigator issued her final investigation report later that month, and provided copies to Jane, John, and the hearing officer.

*The hearing*

A hearing on Jane's complaint was held in June 2019.  A retired justice of the Pennsylvania Supreme Court presided as the hearing officer.  The attorney who advised John during the investigation served as his advisor during the hearing.

Prior to proceeding, the hearing officer confirmed that Jane and John were familiar with 2019 E.O. 1097, that they had

7

reviewed the preliminary report, and that they had had an opportunity to respond to it. She also confirmed that both she and the parties had received copies of the final investigation report. She then explained the process for questioning witnesses.

John submitted a list of proposed questions for the hearing officer to ask Jane and other witnesses. He submitted additional questions at the hearing. The hearing officer asked all of the questions John submitted.

John asked the hearing officer to call D.M., his supervisor at the DRC, as a witness. The hearing officer allowed D.M. to testify.

John also asked the hearing officer to call D.H. as a witness. The hearing officer denied John's request because D.H.'s testimony would be duplicative of D.M.'s and because John's request was untimely.

Jane asked that three witnesses be permitted to testify: D.R., L.I., and T.D. John objected to all three proposed witnesses. The hearing officer allowed L.I. to testify, but did not allow testimony from D.R. or T.D.

John objected to any reference to Jane's SART examination or any police report. The hearing officer replied that "nothing from the [SART examination] was introduced" and that "neither the examination nor the police report was used during the hearing or relied [on] . . . in any way."

During the hearing John said that his interactions with Jane were mutual, reciprocal, respectful, and consensual. His text messages to Jane were not admissions of sexual misconduct; he was simply affirming Jane's emotional distress as he had been trained to do at the DRC.

D.M. said that she had worked at the DRC since 1994. She had supervised John for three years and had provided his training. D.M. said that John was a test proctor and technology lead. His positions did not involve student intake duties, and his training did not include the handling of emotional distress.

*The decision and sanction*

The hearing officer concluded that it was more likely than not that John engaged in sexual intercourse with Jane without her affirmative consent. Jane was more credible than John based on the plausibility of her account, the corroborating evidence, her demeanor while testifying, and the consistency of her testimony. While she "was unable to remember [all of] the details of what had occurred . . . her demeanor in relating what she could remember was unhesitant. Further, she admitted to her prior drinking before [John] arrived[,] and honestly related that her facial cuts and bruises preceded [his] arrival." In contrast, John was "tentative in his testimony[,] and provided a wholly implausible story regarding his confession to her that he had sexually assaulted her." Moreover, there was "overwhelming" evidence that Jane and John engaged in sexual activity— including John's text messages—but he refused to acknowledge as much.

The hearing officer recommended that CalPoly expel John, a penalty consistent with the sanctions imposed in similar situations. John committed a serious offense—even after he had undergone four years of sexual misconduct prevention trainings—and he never accepted responsibility for his actions.

CalPoly agreed with the hearing officer's recommendation and expelled John. John appealed, but his appeal was denied. His petition for writ of mandate was also denied.

## DISCUSSION

### *Scope and standard of review*

A student determined to have committed sexual misconduct may challenge the outcome of the university's disciplinary proceedings in a petition for writ of administrative mandate. (See, e.g., *Doe v. Westmont College* (2019) 34 Cal.App.5th 622, 634 (*Westmont*).) The scope of our review from the judgment on the petition is the same as that of the trial court. (*Ibid.*) We review the university's decision directly, and independently determine whether the university followed its own policies and procedures and whether the student received a fair hearing. (*Id.* at pp. 634-635.) We review the substantive decision for substantial evidence (*Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212, 1231 (*USC*)) "in the light of the whole record" (Code Civ. Proc., § 1094.5, subd. (c)), and the sanction imposed for abuse of discretion (*Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1106 (*UCSD*)).

### *CalPoly followed its sexual misconduct policies and procedures*

John first contends the judgment should be reversed because CalPoly failed to follow its procedures for collecting evidence and ruling on objections to witnesses. (Cf. *Westmont*, *supra*, 34 Cal.App.5th at p. 635 [university must "comply with its own policies and procedures" in sexual misconduct investigation and adjudication].) We disagree.

John claims 2019 E.O. 1097 required the investigator to "collect and consider all of the evidence," including Jane's SART exam, the report she made to police, the receipts from the Uber rides she took on March 17, and the missing six pages of her hospital visit summary. John misreads 2019 E.O. 1097's

10

requirements. 2019 E.O. 1097 did not require the investigator to "collect and consider all of the evidence," as John claims, but instead required her to take "*reasonable steps* to gather all *relevant evidence*." (Italics added.) 2019 E.O. 1097 also permitted the investigator to decline to gather evidence if it was duplicative or irrelevant, or if obtaining it would have been unduly burdensome.

Here, the investigator asked Jane—the only person who could provide her SART exam and police report—to provide those documents. Jane declined to do so. John argues the investigator should have taken additional "reasonable steps" to obtain those documents. What would those steps be? 2019 E.O. 1097 does not give investigators subpoena power.

As to Jane's Uber receipts, the investigator was not required to obtain those because they were not relevant: It is uncontested that Jane had returned from the pub crawl and was at her apartment when John arrived.

The investigator was similarly not required to obtain the final six pages of Jane's hospital visit summary: John has not established their relevance because they contained only follow-up instructions. They were also no longer in Jane's possession, rendering them unduly burdensome to obtain. The investigator thus complied with 2019 E.O. 1097's requirements for gathering evidence.

John next complains that the hearing officer failed to rule on his objections to witnesses D.R., L.I., and T.D. at least one working day before the hearing, as required. But John again misreads 2019 E.O. 1097's requirements. Three working days prior to the hearing the parties are required to submit "objections to, or questions about, the witness list" and "requests for

11

permission to participate in the hearing remotely or out of the physical presence of the other [p]arty." Then, no later than one working day before the hearing, the hearing officer is required to "resolve all pending requests *regarding participation* at the hearing." (Italics added.) The one-day deadline applies to the resolution of participation requests, not objections to witnesses.

But even if the deadline did apply to witnesses, John has not shown that the hearing officer's purported delay harmed him in any way. Two of the witnesses John objected to did not testify. The third, L.I., was questioned by the investigator, and a summary of the information she would testify to at the hearing was given to John in advance. He then submitted questions for L.I., all of which were asked at the hearing. "In this circumstance, John cannot show prejudice." (*Doe v. Regents of University of California* (2021) 70 Cal.App.5th 521, 539.)

John also suggests that the hearing officer should not have permitted L.I. to testify because she was biased against him, but he does not explain how admitting her testimony violated 2019 E.O. 1097 in any way. Regardless, credibility determinations are made by the trier of fact, not this court. (*People v. Boyer* (2006) 38 Cal.4th 412, 480.)

*John received a fair hearing*

Next, John contends he did not receive a fair hearing because CalPoly withheld evidence, prevented him from calling witnesses, and disallowed cross-examination. We reject each of these contentions.

"A [university's] procedure for investigating and adjudicating student sexual misconduct allegations is not analogous to a criminal proceeding." (*Westmont*, *supra*, 34 Cal.App.5th at p. 634.) "The [university] must nevertheless give

the accused student notice of the allegations against [them] and a fair hearing at which [they] may attempt to rebut those allegations." (*Ibid.*) But other than that, the requirements for a fair hearing "are '"flexible" and entail no "rigid procedure."'" (*Ibid.*) "'[N]o particular form of student disciplinary hearing is required under California law.'" (*Id.* at p. 635.)

"Recent cases have described the contours of what a fair hearing requires where, as here, the case turns on witness credibility." (*Westmont*, *supra*, 34 Cal.App.5th at p. 635.) The accused student is entitled to "a hearing before a neutral adjudicatory body." (*Ibid.*) The student must have access to the evidence (*Knight v. South Orange Community College District* (2021) 60 Cal.App.5th 854, 866), and "must be permitted to respond to" it at the hearing (*Westmont*, at p. 635). They "must also have '"a full opportunity to present [their] defenses."'" (*Knight*, at p. 866.)

"The [university] must provide the accused student with the names of witnesses and the facts to which each testifies." (*Westmont*, *supra*, 34 Cal.App.5th at p. 635.) These witnesses must appear at the hearing in some form, though "[i]t is not necessary to place the alleged victim and the accused in the same room." (*Ibid.*) "The accused must be able to pose questions to the witnesses in some manner, either directly or indirectly, such as through the adjudicatory body." (*Ibid.*) Direct cross-examination is not required. (*Id.* at p. 638.)

### 1. *Exculpatory evidence*

John first claims CalPoly denied him a fair hearing by withholding purportedly exculpatory evidence: the police report filed by Jane, her SART exam, the missing six pages of her hospital visit summary, and her Uber receipts. (Cf. *Doe v.*

*University of Southern California* (2016) 246 Cal.App.4th 221, 247 [adjudicatory body may not rely on evidence not disclosed to the accused].) But the existence of each of these items was disclosed to John in the investigator's preliminary report. Had he actually considered them exculpatory, John could have requested that the investigator obtain the items from Jane or ask her about them. John did not do so. His claim that CalPoly withheld exculpatory evidence is accordingly forfeited. (*Franz v. Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 143 (*Franz*).)

It also lacks merit. The existence of the police report, SART exam, hospital visit summary, and Uber receipts were all disclosed to John in the preliminary report. The preliminary report also stated that Jane declined to produce the police report and SART exam and that those items would "not be considered for this investigation." In her decision, the hearing officer similarly stated that she did not consider these items. She also did not consider the final six pages of Jane's hospital visit summary, as Jane had discarded them. And the Uber receipts were irrelevant to any disputed material issue. There was thus no intentional withholding of exculpatory evidence that was considered by the hearing officer but not provided to John.

### 2. Exculpatory witnesses

John next claims CalPoly prevented him from calling exculpatory witnesses: Jane's Uber driver(s); her mother; her friend, M.K.; and his boss at the DRC, D.H. But John does not identify what, if any, information the Uber driver(s) might have had that would be relevant. Claims made without legal analysis are forfeited. (*Golden Drugs Co., Inc. v. Maxwell-Jolly* (2009) 179 Cal.App.4th 1455, 1472 (*Golden Drugs*).)

14

The preliminary report identified Jane's mother and M.K. as potential witnesses, and indicated what Jane had disclosed to them. The report also stated that the investigator did not interview them because they did not witness what occurred between Jane and John and because any information they might have had would have been duplicative of that obtained from L.I. John, after receiving a copy of the report, did not ask the investigator to interview them, nor did he ask that they testify at his hearing. His belated claim that they might have provided exculpatory evidence is therefore forfeited. (*Franz, supra,* 31 Cal.3d at p. 143.)

The hearing officer declined to have D.H. testify because her testimony would have been duplicative of D.M.'s. John's request to have D.H. testify was also untimely. John ignores both of these bases for the hearing officer's decision to exclude D.H. as a witness, and provides no analysis for why that decision was in error. His claim is forfeited. (*Golden Drugs, supra,* 179 Cal.App.4th at p. 1472.)

*3. Cross-examination*

John claims he was denied a fair hearing because he did not have the opportunity to cross-examine witnesses. John misunderstands what the law requires.

As this court has explained previously, "[a] student accused of sexual misconduct is not entitled to *directly* cross-examine the alleged victim or other witnesses who testify at a sexual misconduct hearing." (*Westmont, supra,* 34 Cal.App.5th at p. 638, italics added.) What is instead required is that the accused student be permitted to pose questions *indirectly*, such as through the hearing officer. (*Id.* at p. 639.) Numerous courts have recognized the adequacy of conducting cross-examination

15

through this procedure (see, e.g., *ibid.*; *USC, supra,* 29 Cal.App.5th at pp. 1237-1238, *UCSD, supra,* 5 Cal.App.5th at p. 1084), and the Legislature has since enshrined it into state law (Ed. Code, § 66281.8, subd. (b)(4)(A)(viii)(I) & (III)). Because that procedure was followed here, John received a fair hearing.

*Substantial evidence supports the hearing officer's findings*

John next contends substantial evidence does not support the hearing officer's findings that: (1) Jane was credible, (2) Jane was incapacitated due to drugs or alcohol, (3) John knew or should have known that Jane was incapacitated, and (4) John and Jane had sexual intercourse. But John did not challenge Jane's credibility in the trial court proceedings below. That contention is forfeited. (*Rand v. Board of Psychology* (2012) 206 Cal.App.4th 565, 587 (*Rand*).) The others lack merit.

When reviewing the hearing officer's decision, we do not weigh the evidence, resolve conflicts therein, or consider the credibility of witnesses. (*UCSD, supra,* 5 Cal.App.5th at p. 1073.) Instead, we accept all evidence that supports the decision, draw all inferences in support of it, and disregard any contrary evidence. (*Id.* at p. 1074.) We presume the decision was correct, and will not substitute our own judgment for it so long as it could have been made by a reasonable person. (*Id.* at p. 1073.) It is "'[o]nly if no reasonable person could reach the conclusion reached by the [officer], based on the entire record before [her], [that we would] conclude that the . . . findings are not supported by substantial evidence.' [Citations.]" (*Ibid.*)

Substantial evidence supports the findings that Jane was incapacitated and unable to affirmatively consent when she and John engaged in sexual intercourse. On the morning of the incident, Jane had four or five shots of alcohol before going to a

16

pub crawl. She was so intoxicated that she blacked out on the ride downtown. She fell asleep after returning home, waking up when John knocked on the door. When she opened it, John noticed that she looked disheveled and had cuts on her lip and a bloody nose. Jane then drank two more shots of alcohol and a glass of beer with John before blacking out again. After she had fallen asleep, her breathing was so labored that John felt the need to check her pulse. Such evidence overwhelmingly supports the hearing officer's finding that Jane was incapacitated.

The evidence also supports the finding that John knew or should have known Jane was incapacitated and unable to affirmatively consent to sexual intercourse. When he arrived at her apartment, John knew that Jane had already been drinking alcohol at a bar crawl. The two of them then drank more alcohol together. More significantly, John admitted he knew Jane was incapacitated: In a subsequent text message exchange, John admitted that he understood that Jane was "way too gone to consent." That alone is substantial evidence in support of the hearing officer's finding.

We reach the same conclusion regarding John's claimed lack of evidence that he and Jane engaged in sexual intercourse. When she awoke on March 18, Jane's vagina was sore and her underwear were missing. She was "'freaked out'" and told L.I. that she thought she had been raped. She later asked John about what had happened the day before, and he said that they had had sex. He then admitted, in a text message, that he had sexually assaulted Jane. Substantial evidence thus supports the finding that John and Jane had sexual intercourse.

*The expulsion sanction was not overly harsh*

Finally, John contends the decision to expel him from

17

CalPoly was overly harsh. But John did not raise this contention in the proceedings below. It is forfeited. (*Rand*, *supra*, 206 Cal.App.4th at p. 587.)

It also fails on the merits. We review CalPoly's decision to expel John for abuse of discretion. (*UCSD*, *supra*, 5 Cal.App.5th at p. 1106.) Pursuant to this standard of review, we "cannot 'substitute [our] discretion for that of the [university] concerning the degree of punishment imposed.'" (*Ibid.*) "'It is only in the exceptional case, when it is shown that reasonable minds cannot differ on the propriety of the penalty, that an abuse of discretion is shown.'" (*Ibid.*)

Here, John committed a serious offense: He engaged in sexual intercourse with a person he knew or should have known was incapacitated and unable to affirmatively consent. John was a senior when the incident occurred, and had undertaken four years of sexual misconduct prevention trainings. And while he had no prior allegations of misconduct, he never admitted responsibility for what occurred with Jane. Ordering John's expulsion—a penalty consistent with the sanctions imposed under 2019 E.O. 1097 in similar situations—was not an abuse of discretion. (Cf. *UCSD*, *supra*, 5 Cal.App.5th at pp. 1106-1107 [upholding suspension of one year plus one quarter where student digitally penetrated another's vagina without her consent and never took responsibility for his actions].)

DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

NOT TO BE PUBLISHED.


GILBERT, P. J.


We concur:


YEGAN, J.


PERREN, J.*


---

* Retired Associate Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Tana L. Coates, Judge

Superior Court County of San Luis Obispo

_____

Hathaway Parker, Mark M. Hathaway and Jenna E. Parker for Plaintiff and Appellant.

California State University Office of General Counsel, Susan Westover and William C. Hsu for Defendants and Respondents.